**DAWCO CONSTRUCTION, INC.,**
**Plaintiff–Appellee,**

v.

**The UNITED STATES,**
**Defendant–Appellant.**

No. 90–5074.

United States Court of Appeals,
Federal Circuit.

April 3, 1991.

Richard D. Corona, Corona, Balistreri & Ramseyer, of San Diego, California, argued, for plaintiff-appellee. With him on the brief was C. Kevin Bond.

Donald E. Kinner, Atty., Commercial Litigation Branch, Dept. of Justice, of Washington, D.C., argued, for defendant-appellant. With him on the brief, were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Thomas W. Petersen, Asst. Director and Mary Mitchelson, Asst. Director.

Before MARKEY, ARCHER, and MICHEL, Circuit Judges.

MICHEL, Circuit Judge.

The United States appeals the judgment of the United States Claims Court awarding Dawco Construction, Inc. ("Dawco") $529,935, plus interest, as an equitable adjustment for differing site conditions encountered in performance of the landscape portion of a housing refurbishment contract. *Dawco Construction, Inc. v. United States*, No. 450–86C (Cl.Ct. Nov. 17 & 22, 1989, 18 Cl.Ct. 682 and Feb. 5, 1990). Defendant-appellant also appeals the Claims Court ruling that it had jurisdiction to entertain the contractor's claim, contending that Dawco did not "submit" a claim to the contracting officer, as required under the Contract Disputes Act. 41 U.S.C. § 605 (1988).

Although the Claims Court correctly ruled that it could hear Dawco's claim, it erroneously adopted the "jury verdict method" to measure the quantum of damages due the contractor. Accordingly, we affirm-in-part, upholding its ruling on jurisdiction, reverse-in-part, overturning the judgment awarding damages, and remand for a proper determination of damages.

## BACKGROUND

### A. The Contract Dispute

Dawco was awarded a contract to refurbish the Cabrillo–Larksdale Naval housing project near San Diego, California, in August 1983. As part of the contract, Dawco was also required to landscape the grounds around six individual housing areas, a total of 903,000 square feet. Dawco, in turn, subcontracted this portion of the work to J.C. Landscape ("JCL") for $460,000.

After the contract award, the Navy determined that the grading required by the contract specifications would not produce acceptable drainage and in a September 26, 1983 letter, directed Dawco to suspend all landscaping work until further notice and to continue only refurbishing the buildings. The Navy then developed a new drainage plan calling for installation of an underground drainage system in four of the six areas. The drainage system redesign was detailed in a Change Order Request, and was accompanied by a request for a cost proposal. The Navy, however, rejected Dawco's proposed costs, presented in a May 21, 1984 letter from JCL to the Navy, and decided instead to landscape only the two of the six areas that did not need underground drainage lines.

On May 29, 1984, the Navy formally issued a change to the contract, designated "PCO 20," "[d]elet[ing] entirely" all landscaping work on four areas and directing Dawco to complete, in accord with the original contract specifications, the landscaping site work on the other two areas. In addition, the two areas were enlarged by 35,900 square feet. The change resulted in a net reduction of 397,540 square feet, or at least 44 percent, of the original 903,000 square foot area to be landscaped.

After resuming the landscaping work over the two areas, JCL encountered the differing site conditions that are the subject of this appeal. JCL contended that the areas were not maintained during the eight-month suspension in work, causing

the site to "deteriorat[e] significantly." *Dawco Construction, Inc. v. United States,* 18 Cl.Ct. 682, 685 (1989). The resulting new conditions consisted primarily of overgrowth and other obstructions on or within the topsoil, characterized by the Claims Court as "unexpected massive rambling dispersed subsurface running tree roots, rock, boulders, cobble, abandoned water lines not shown on the drawings, weed root masses, demolition debris, galvanized copper piping, asphalt, [and] concrete." *Id.* at 695–96.

On October 9, 1985, Dawco's counsel sent a letter to Richard G. Thurman, the Navy "contracts manager" and the representative of the Resident Officer In Charge of Construction ("Resident Officer"), explaining that Dawco "would like to start settlement discussions as soon as possible" concerning additional costs arising from the differing site conditions. Jt.App. at 110. Although there may have been an earlier undated proposal in the same amount, on November 22, 1985, the Navy received a proposal from Dawco seeking $325,063 as an equitable adjustment. According to Thurman's letter of November 15, 1985, Dawco had, up to that time, "made no presentation" concerning Dawco's costs as the prime contractor, only JCL's as subcontractor, on the landscaping work. Jt.App. at 111. Thurman stressed that the Navy "must have your [complete] proposal in hand in order to obtain funding and proceed to negotiation." *Id.* The November 22 proposal, however, was, according to Thurman, also limited to JCL's proposed costs.

Two months later, on January 9, 1986, Dawco's counsel outlined the history of its "claim" and "request[ed] a Contracting Officers [sic] Final Decision on [its] claim of $325,063.00, which was submitted to the Government on or about November 15, 1985." Jt.App. at 115. Attached to the letter was a certification signed by Dawco's president, James H. Benson, and a list of apparently estimated costs.

On February 27, 1986, however, Thurman sent Dawco a letter stating that the Resident Officer was:

> unwilling and procedurally unable to negotiate a settlement of the PCO # 20 landscape issue *for any additive amount.*
>
> We will forward the issue for a contracting officer's final decision as soon as possible. Unless you submit a new proposal, we will forward your undated proposal for $325,063.... Please submit a certification in accordance with the "Disputes" clause of the contract's General Provisions.

Cl.Ct.Trial Exhibit No. 234 (emphasis added).

On April 9, 1986, Thurman wrote Dawco and acknowledged receipt of an April 2, 1986 letter from Dawco.[1] In this letter, Thurman recited the Navy's reasons for construing Dawco's earlier letters as not constituting proper submission of a certified claim. According to Thurman, Dawco's assertion that it submitted a claim in May 1984 was "not possible" because the Navy did not direct Dawco to proceed on the contract before May 29, 1984—the date the PCO was issued. In addition, the May 1985 letter, Thurman explained, was insufficient because it consisted only of JCL's proposal and did not include "a listing of [Dawco's] own costs and credits." Jt.App. at 121. Since only the April 2, 1986 letter was sufficient, according to the Navy, to constitute a proper claim, Thurman wrote that the 60–day claim resolution requirement of the Contract Disputes Act was triggered by receipt of the April 2, 1986 letter.

Nevertheless, because of Dawco's failure to "identify the difference between the cost to perform the landscape work as contracted for and the cost to perform the work with the deletions and differing site conditions," the contracting officer declined to issue a decision on the equitable adjustment due Dawco. Govt.Br. at 10.

On July 21, 1986, well after the 60–day period for decision had expired, Dawco

---

**1.** We received no explanation why Dawco's April 2, 1986 letter to the Navy was not made part of the record before us, nor have we been able to locate it in the Claims Court record.

filed suit in the Claims Court seeking an additional $591,678 for the landscape portion of the contract.

### B. Claims Court Proceedings

In a series of orders ultimately awarding Dawco an equitable adjustment of $529,-935, the Claims Court began by acknowledging the "natural assumption" that a contract change reducing the amount of work to be performed "would, on its face, entitle [the Navy] to a corresponding reduction in the price of the [sub]contract." *Dawco*, 18 Cl.Ct. at 685. However, the court explained, Dawco, and its subcontractor, JCL, both formulated their bids on the "existing conditions" at the time of bidding. By the time JCL resumed its landscaping work, those conditions had changed significantly, nullifying the "natural assumption" that a corresponding decrease in costs should follow an at least 44 percent decrease in the area to be landscaped.

At trial, the court relied heavily on the testimony of Lance Edmunson, the owner/operator of a tractor service, to whom JCL subcontracted the excavation work needed to overcome the differing site conditions. It was Edmunson, the court said, who "bore the main brunt of the extra efforts; his task was to remove the thatch and roots and grade the surface. In so doing, he directly encountered, more than any other person or firm, the material that constituted the differing site condition." *Id.* at 700. The court found that Edmunson's records, unlike Dawco's or JCL's, "were kept in such a manner that he could show to the satisfaction of the court that it cost him an additional $8,100 to perform the extra work caused by the differing site condition, an increase of twenty-seven percent." *Id.*

To determine the equitable adjustment, the Claims Court adopted the "jury verdict method," in part due to the "wildly divergent" estimates of costs presented by Dawco and the government. *Id.* at 699. It concluded that Dawco was unable, despite Edmunson's testimony, to "prove actual damages," although the court was nevertheless able "to arrive at a fair approximation of the damages." *Id.* at 698.

Initially, the court calculated the effect of the change order, decreasing the area to be landscaped by at least 44 percent on the subcontract as a whole, and reduced the original price from $460,000 to $303,155. That price included a 17.6 percent surcharge, assessed by the court to cover additional expenses attributed to a "loss of economy of scale," because the contract had originally been bid on a substantially larger area. *Id.* at 700. To that amount, the court added $81,852 for "damages suffered by JCL by virtue of the differing site condition." *Id.* These additional "damages" were derived by extrapolating from the 27 percent figure provided by Edmunson's testimony to estimate the costs of *all* of JCL's extra work. *Id.* This first "adjustment" was added to the revised subcontract price and together they totalled $385,-007.

To that amount the Claims Court then added $15,000 for claim preparation costs, $15,000 to cover the premium on the additional subcontractor's bond insurance, and $1,608 for ancillary repairs. From this subtotal, now standing at $416,615, the court calculated Dawco's field and home office overhead and the "prime on subcontractor rate" (the contractor's premium) at $113,320 and added that to the subtotal, bringing the quantum of the equitable adjustment to $529,935. This amount constituted, the court said, the damages suffered by plaintiff and JCL due to "extra work found to be caused by the differing site condition." *Id.* at 704. From this amount, the court subtracted the original subcontract price, $460,000, and found that the total equitable adjustment due Dawco was $69,935 with interest accruing from May 21, 1984, the date of JCL's cost proposal, forwarded by Dawco, in response to the change order request.

On November 22, 1989, the Claims Court amended, apparently *sua sponte*, its November 17, 1989 order by deleting its final paragraph in which an equitable adjustment of $69,935 was awarded and, instead, ruled that Dawco was entitled to $529,935.

*Dawco Construction, Inc. v. United States*, 18 Cl.Ct. 682 (1989).

On February 5, 1990, the court issued another order, to clarify its November 22 order, stating that Dawco was entitled to an *equitable adjustment* totalling $529,-935. *Dawco Construction, Inc. v. United States*, No. 450–86C (Cl.Ct. Feb. 5, 1990). The court also rejected the government's request, made on motion for reconsideration, that the amount be reduced by $273,-472 which represented payments made by the government on the contract, both because the argument was not made at trial and the payments, if any, "were for services outside the limited scope of this Opinion." *Id.* at 4.

On appeal, the government argues that under the Claims Court decision, the Navy may be obligated to pay Dawco at least $989,935 for the total subcontract work, in addition to the $273,472 allegedly previously paid, for a subcontract originally priced at $460,000.

## QUESTIONS PRESENTED

(1) Whether the May 21, 1984 proposal or any other correspondence in the record from Dawco constituted a "claim" under the Contract Disputes Act;

(2) If so, was a claim properly "submitted" to the contracting officer as required under the Contract Disputes Act;

(3) Whether the Claims Court committed legal error by employing the "jury verdict method" to establish the amount of the equitable adjustment; and

(4) Whether the government is precluded from challenging the assessment of the subcontractor's bond premiums, and whether the Claims Court erred by not deducting payments made by the government on the contract.

## DISCUSSION

### Jurisdiction

Our jurisdiction over this appeal is based on 28 U.S.C. § 1295(a)(3) (1988) (exclusive jurisdiction over appeals from the Claims Court).

### Standard of Review

We review the Claims Court's decision on a question of law to determine whether it is incorrect as a matter of law, and its factual findings under the clearly erroneous standard. *Atlas Corp. v. United States*, 895 F.2d 745, 749 (Fed.Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990).

## I

■ The Contract Disputes Act ("CDA" or "Act") requires all government contractors seeking redress to submit and certify a written claim to the contracting officer and request a final decision. 41 U.S.C. § 605 (1988). *W.M. Schlosser Co. v. United States*, 705 F.2d 1336, 1338–39 (Fed.Cir. 1983) (CDA's requirements are mandatory and are jurisdictional prerequisites).

In arguing that the Claims Court did not possess jurisdiction to entertain this case, the government contends that Dawco never "submitted" a *"claim"* to the contracting officer upon which a final decision could be made—the prerequisite for an appeal. Instead, the government characterizes all communications made before April 2, 1986 from Dawco to various Navy personnel as merely business correspondence, cost estimates, and settlement proposals.

■ The CDA does not explicitly list comprehensive requirements for a "claim" in all situations. *See Paragon Energy Corp. v. United States*, 645 F.2d 966, 976, 227 Ct.Cl. 176 (1981). Therefore, a contested claim's sufficiency may properly be evaluated against regulations implementing the CDA, the language of the contract in dispute, and the facts of the case. *Gardner Machinery Corp. v. United States*, 14 Cl.Ct. 286, 290 (1988).

■ The Federal Acquisition Regulations ("FAR"), which implement the CDA, define "claim" as:

a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, ... A voucher, invoice, or other routine request for payment

that is not in dispute when submitted is not a claim.

48 C.F.R. § 33.201 (1990). Clearly, the FAR mandates that, *inter alia,* a claim must seek payment of a sum certain as to which a dispute exists at the time of submission.

Similarly, the contract's disputes clause, containing the standard language mandated by the Defense Acquisition Regulations states that a "request for payment that is not in dispute when submitted is not a claim for purposes of the Act." The language is not ambiguous, and means what it says: A contractor and the government contracting agency must already be *in dispute* over the amount requested. Unilateral cost proposals or correspondence suggesting disagreement during negotiations, while they may ultimately lead to a dispute, do not, for purposes of the Act, satisfy the clear requirement that the request be in dispute. *Mayfair Construction Co. v. United States,* 841 F.2d 1576, 1577 (Fed. Cir.), *cert. denied,* 488 U.S. 980, 109 S.Ct. 528, 102 L.Ed.2d 560 (1988) ("It is beyond cavil that under this clause, no claim exists unless it involves a dispute.").

## A.

■ The Claims Court ruled that the May 21, 1984 letter was, "but for one factor, ... [a claim] certified and submitted to [the Navy]." *Dawco,* 18 Cl.Ct. at 703. The "one factor" missing was "Dawco's overhead claim." Its absence, however, was not fatal, the court reasoned, because the parties had previously discussed these costs. Therefore, "it was unconscionable for [the Navy] to refuse to recognize the claim." *Id.*

The government argues that the May 21, 1984 "cost proposal" could not, under law or the facts of this case, constitute a "claim." The Claims Court's reasoning, the government suggests, is based on two flawed premises: first, that there was a "request for payment in dispute," and second, that a subcontractor, in this case, JCL, can submit a claim. Because there was no "request for payment in dispute" as contemplated by the Act and explicitly required by the regulation and this contract, we need not, and do not, address whether a subcontractor, *in lieu* of the prime contractor, may submit a claim under a government contract.

As the government correctly notes, no evidence has been cited indicating that, as of the May 21, 1984 correspondence, either a dispute existed, or that that letter constituted anything more than a cost proposal. That letter's language does not even anticipate that a dispute may ever arise; on the contrary, James H. Benson, Dawco's president, states that Dawco is "proceeding with the understanding an equitable adjustment will be made for this constructive directive." Jt.App. at 63. Moreover, this letter *predates* the issuance of the May 29, 1984 PCO by eight days. And even though a certification accompanied the letter—articulating the exact language required by the contract—the mere fact of its attachment does not transform the May 21, 1984 letter into anything more than a cost proposal.

Contrary to the Claims Court's reasoning, our holding that the May 21, 1984 letter does not satisfy the Act's requirements does not place "form over substance." Rather, the Claims Court erred in finding that this letter, simply because it encompassed some aspects of a "claim," constituted a "claim" under the Act. The Act and its implementing regulation require that a "claim" arise from a request for payment that is "in dispute." To uphold the Claims Court reasoning that the May 21, 1984 letter was a "claim" under the Act would require us to ignore the FAR's plain language. This we decline to do.

## B.

■ If, then, the May 21, 1984 letter was not a "claim," does any other letter in the record qualify as a "claim" under the Act? According to the Claims Court, "[t]he only other claim submission that need be considered was sent to [the Navy] on May 6, 1985 [sic, May 2]." *Dawco,* 18 Cl.Ct. at 703. In this letter, Dawco forwarded to the Navy "certifications" to its April 4,

1985 "claim," consisting of a cover letter with JCL's "claim proposal" attached. Jt. App. at 104. The April 14 letter had urged the Navy to "review the proposal and schedule negotiations immediately." *Id.* at 103. The Claims Court determined that the combination of the April 4, 1985 letter and May 2, 1985 transmittal of the certification affidavits satisfied the CDA's "claim" requirements. According to the court, the only "flaw" of the April 4/May 2, 1985 letters was their failure to state a sum certain Dawco believed due. Because "negotiations" had occurred since the PCO's issuance, however, the court found that the Navy "had knowledge of the full claim and could have addressed it." *Dawco,* 18 Cl.Ct. at 703. Therefore, the court concluded, "[t]he failure to specifically include [an amount due] was, if anything, a technicality of the kind that this court will not consider to deny monies due plaintiff." *Id.*

Again, it is clear that the "flaw" underlying these letters was not only what the Claims Court discussed and dismissed but more fundamentally that at the time of transmittals no dispute existed. *See Mayfair Construction Co.,* 841 F.2d at 1577 ("a pre-dispute, negotiation posture" does not satisfy jurisdictional requirements of CDA). From the letters' language, it is apparent that Dawco was attempting to spur negotiations on an equitable adjustment. The letters are barren of any indication that Dawco was discontinuing negotiations with Thurman in favor of seeking a final decision by the contracting officer.

■ Both parties, however, concede that the constituent "claim" requirements of the CDA are met by the April 2, 19*86* letter. As noted above, this letter was not made part of the record here or, apparently, at the Claims Court. But given the descriptions of it in the record, as well as the government's concession that it did meet all requirements under the CDA, its absence does not preclude our relying on it.

In a January 9, 1986 letter, Dawco abandoned its attempts at negotiation and requested that the "Contracting Officer ... issue said Final Decision." Jt.App. at 115. From Thurman's April 9, 1986 letter to

Dawco acknowledging the April 2 letter, it is clear that the April 2 letter contained not only a list of Dawco's and JCL's costs but was also a certification. What primarily distinguishes this letter from its predecessors is that negotiations had clearly been abandoned, and the amount claimed was definitely in dispute.

Accordingly, for the reasons stated above, we reverse the Claims Court holding that the May 21, 1984 letter was a "claim" under the CDA as incorrect as a matter of law.

## II

■ The government next argues that even though the April 2 letter was a "claim" under the CDA, it was never properly "submitted" to the contracting officer, depriving the Claims Court, and derivatively this court, of jurisdiction.

The CDA requires, *inter alia,* that "[a]ll claims by a contractor against the government relating to a contract ... *shall be submitted to the contracting officer* for a decision." 41 U.S.C. § 605(a) (emphasis added). The government reads this language as mandating that a contractor claim must be *addressed* or *delivered to* the contracting officer, personally. It argues that Dawco improperly "submitted to the Navy contracts manager or the Resident Officer in Charge of Construction," Govt.Br. at 19, all its correspondence, including the April 2, 1986 letter, rather than to the "contracting officer," defined in the contract as the "Commander, [of the Naval Facility], the Acting Commander, their successors, or their representatives specially designated for this purpose." Jt.App. 48–49.

The government does not contend that the contracting officer never received the claim; it objects solely on the ground that the April 2, 1986 letter, although forwarded to the contracting officer, was not more specifically *addressed to* the contracting officer. The government misconstrues the statute, as does the authority it cites. *See West Coast General Corp. v. United States,* 19 Cl.Ct. 98, 100–101 (1989) (no jurisdiction because claim sent to resident offi-

cer instead of contracting officer, even though contracting officer issued a final decision).

The Act simply requires the contractor's claim to be "submitted" to the contracting officer. Neither the Act, nor its implementing regulations, instructs the contractor how this must be accomplished. As Judge, now Circuit Judge, Rader correctly explained in *American Pacific Roofing Co. v. United States*, 21 Cl.Ct. 265, 268 (1990), Congress deliberately left the language concerning submission to the contracting officer "broad ... to permit appropriate Government officers to receive written claims and forward them to the [contracting officer]."

In context, the Act's requirement that a claim must be "submitted" does not govern how the letter asserting the claim is to be addressed, or to whom it must first be given. It simply identifies the person to whom the dispute is to be "submitted" for a final decision. Webster's Dictionary defines "submit" as:

1. To surrender or yield (oneself) to the will or authority of another.... 3. To commit (something) to the consideration or judgment of another.

Webster's II New Riverside University Dictionary (1984). Clearly, the purpose of the Act's "submit" language is not related to the minutia of addressing or delivering claim letters, as the government argues, but is merely a requirement that once a claim is made, the parties must "commit" the claim to the contracting officer and "yield" to his authority to make a final decision.

Contrary to the government's assertion, our reading of the "submission" requirement will not adversely affect the speed and efficiency of the claims process. A contractor has numerous incentives to identify the contracting officer and to forward its claim to the contracting officer in the most efficient manner possible. For example, the 60–day period in which the contracting officer must make a final decision begins only after the claim's *receipt* by the

contracting officer. 41 U.S.C. § 605(c)(1), (c)(2) (1988). The sooner a contractor ensures receipt by the contracting officer, the sooner a final decision will be issued, and the sooner it will receive any award. An even more compelling incentive is that interest, if any, on any adjustment accrues from the date the "contracting officer *receives* the claim." 41 U.S.C. § 611 (1988) (emphasis added). Under § 611, delayed delivery to the contracting officer will cost the contractor money in a decreased interest payment. As the *American Roofing* court concluded, it is the "contractor [who] bears the risk for delayed or lost submissions prior to receipt by the [contracting officer]." 21 Cl.Ct. at 268.

Accordingly, we hold that Dawco's claim was "submitted" as required by the Act.

### III

■ To establish the amount of the equitable adjustment due Dawco, the Claims Court resorted to the "jury verdict method." *Dawco*, 18 Cl.Ct. at 696–700. This approach, most often employed when damages cannot be ascertained by any reasonable computation from actual figures, however, is not favored and may be used only when other, more exact, methods cannot be applied. *Specialty Assembling & Packing Co. v. United States*, 355 F.2d 554, 572, 174 Ct.Cl. 153 (1966). Before adopting the "jury verdict method," the court must first determine three things: (1) that clear proof of injury exists; (2) that there is no more reliable method for computing damages; and (3) that the evidence is sufficient for a court to make a fair and reasonable approximation of the damages. *WRB Corporation v. United States*, 183 Ct.Cl. 409, 425 (1968). In this case, the court's determinations that Dawco had met the first and second of these requirements were erroneous.

■ The selection of the proper method for determining damages is a legal decision which we review non-deferentially on the basis of reasonableness.[2] *Cf. Electron-*

---

**2.** Even though we determine that the Claims Court incorrectly resorted to the "jury verdict

method," we cannot, as an appellate tribunal, make factual findings that would establish the

*ic and Missile Facilities, Inc. v. United States*, 416 F.2d 1345, 1354, 189 Ct.Cl. 237 (1969) (review goes to the reasonableness of what the agency did on the basis of the evidence before it). Although the Claims Court agreed that Dawco had submitted what amounted to a "total cost" claim,[3] it nevertheless resorted to the "jury verdict method," rather than require a detailed and documented cost breakdown from Dawco. The court's conclusion that the "jury verdict method" was appropriate was based on a determination that it was "not possible for [Dawco] to prove actual damages, [although] sufficient information exist[ed] to enable the court to arrive at a fair approximation of the damages." *Dawco*, 18 Cl.Ct. at 698. However, "it is equally well-settled that the amount of the recovery can only be approximated in the format of a 'jury verdict' where the claimant can demonstrate a *justifiable inability to substantiate* the amount of his resultant injury by direct and specific proof." *Joseph Pickard's Sons Co. v. United States*, 532 F.2d 739, 742, 209 Ct.Cl. 643 (1976) (emphasis added).

Contrary to Dawco's assertion, the contractor bears the burden of establishing that no more reliable method is available than the "guesstimate" of the "jury verdict method," *i.e.*, a method that would more precisely *calculate* the cost for the extra work. *Id.; see also Boyajian v. United States*, 423 F.2d 1231, 1235–36, 191 Ct.Cl. 233 (1970). This burden is especially relevant here. From the record, as well as testimony cited by the court, Dawco did not establish that it could not have identified to an acceptable degree of certainty its and

JCL's costs attributable to the differing site conditions. Its failure to do so should have precluded the Claims Court from adopting the "jury verdict method." *Boyajian*, 423 F.2d at 1236. Here, the Claims Court found that Edmunson, the tractor operator hired by JCL, who, the court said, "[f]ortuitously ... bore the main brunt of the extra effort," was able to keep his "records, unlike [Dawco's] and JCL's, ... in such a manner ... [to] show to the satisfaction of the court that it cost him an additional $8,100 to perform the extra work." *Dawco*, 18 Cl.Ct. at 700. However, the record is barren of other evidence that, under the *WRB* test's first prong, Dawco suffered any injuries beyond Edmunson's costs and any related JCL and Dawco overhead. Without such proof, the "jury verdict method" cannot properly be used to estimate what would be nothing more than speculative damages. *See Assurance Co. v. United States*, 813 F.2d 1202, 1205 (Fed.Cir.1987).

Nor has Dawco demonstrated any "justifiable inability to substantiate" its damages, *Joseph Pickard's Sons*, 532 F.2d at 742, beyond Edmunson's documented additional expenses. Clearly, Dawco was in an ideal position to detail all its costs. Or, at least, it could have, and should have, been. The issuance of a change order request should signal to the prudent contractor that it must maintain records detailing any *additional* work, just as should the encountering of differing site conditions. The Claims Court has not identified, nor has Dawco presented us with, any justification why such precision, or something sufficiently close, could not have been accom-

---

3. The government contended that Dawco, in effect, presented the court with a "total cost claim," *i.e.*, a summary of expenses attributable to the execution of the contract as a whole. What the court should have required, the government asserts, is an "actual cost claim,"

proper amount of the equitable adjustment. *Assurance Co. v. United States*, 813 F.2d 1202, 1205 n. 3 (Fed.Cir.1987). Here, our decision is limited to the review of the Claims Court's selection of the method to determine damages. To the extent we discuss the Claims Court's application of the "jury verdict method," we do so only to underscore the perils associated with this method.

detailing only the expenses arising from the differing site conditions. "Total cost claims," like the "jury verdict method," are not favored and should only be resorted to when "actual costs" cannot be determined. *Wunderlich Contracting Co. v. United States*, 351 F.2d 956, 965, 173 Ct.Cl. 180 (1965); *G.M. Shupe, Inc. v. United States*, 5 Cl.Ct. 662, 676 (1984). Here, however, since we conclude that Dawco has not shown it could not have presented the court with an "actual cost claim," there is no reason for us to reach the issue of whether a "total cost claim" submission was required rather than a "jury verdict method" approximation.

plished as to Dawco's other costs, including any additional overhead. Therefore, Dawco's inability to substantiate the existence, to any degree of certainty, of costs beyond those incurred by Edmunson, precludes resort to the "jury verdict method." *See Electronic and Missile Facilities*, 416 F.2d at 1358.

If anything, the twisted road the Claims Court traveled from Edmunson's $8,100 documented additional expense to the court's final determination that Dawco was entitled to $529,935 as an equitable adjustment for the differing site conditions underscores the dangers of using the "jury verdict method." Its primary peril, as evidenced in this case, is the risk that unrealistic assumptions will be adopted and extrapolated, greatly multiplying an award beyond reason, and rewarding preparers of imprecise claims based on undocumented costs with unjustified windfalls. Here, the Claims Court was presented with a well documented actual additional expense of $8,100 by Edmunson. That additional expense by the independent subcontractor who "bore the brunt of the extra work" ballooned, under the "jury verdict method," by a factor of 10 to $81,852 as an estimate of JCL's cost. Then, as described above, that figure increased to an equitable adjustment due Dawco of $529,935, for the landscape work compared to the original price of $460,000. That result is roughly twice as much money for about half the landscaping work despite little proof of causation by the differing site conditions.

Clearly, the "actual cost method" is preferred because it provides the court, or contracting officer, with documented underlying expenses, ensuring that the final amount of the equitable adjustment will be just that—equitable—and not a windfall for either the government or the contractor.

Because the record does not show that Dawco justifiably could not have submitted an "actual cost claim," we remand to the Claims Court for a redetermination of the equitable adjustment due Dawco by the "actual cost method."

## IV

After calculating costs it related to the differing site conditions, the Claims Court then added in several miscellaneous costs. Of these additional costs, the government only disputes the Claims Court assessment of $15,000 for additional bond insurance. However, as Dawco points out, and the Claims Court expressly indicated, this additional cost was presented separately in the Claims Court proceeding, and was not objected to by the government there. *Dawco*, 18 Cl.Ct. at 701. As a result, the government is precluded from challenging it here. *Fruin–Colnon Corp. v. United States*, 912 F.2d 1426, 1429 (Fed.Cir.1990); *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1566 (Fed.Cir.), *cert. denied*, 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988) (failure to object in a timely fashion constitutes a waiver).

Finally, the government contends that the Claims Court erred by failing to deduct $272,472 already paid by the Navy to Dawco for performance of the contract. The Claims Court concluded that it "has only been shown the barest hint of possibility that these speculative payments were for the *work at issue in this case*." *Dawco*, slip op. at 4. (Feb. 5, 1990) (emphasis added). Before this court, Dawco argues that "[t]hough there were partial payments made during the course of the contract, they were made for work performed *outside of this case* and the court's equitable adjustment." Dawco Br. at 40 (emphasis added).

While the government's concern over possibly paying twice for the same work is understandable, it is clear that the Claims Court decision referred only to payments arising from the differing site conditions, not from the contract as a whole. We do not read the Claims Court's opinion to require the government to make double payments on the contract. Undoubtedly, what payments the government has made it may subtract *pro tanto* from the total due Dawco for the contract, including any post-remand equitable adjustment. As the Claims Court noted, the government is also protected from overpayment because Dawco's

counsel "is experienced in government contracting and fully aware of the penalties attached to any fraudulent claim against the United States, [and Dawco] ... would not make a claim for money to which it were not entitled." *Dawco,* slip op. at 5 (Feb. 5, 1990); *see, e.g.,* 41 U.S.C. § 604 (1988).

## CONCLUSION

The decision of the Claims Court is affirmed-in-part, as to jurisdiction, reversed-in-part as to determination of the equitable adjustment and the date on which interest accrues, and remanded. On remand the Claims Court is to consider only costs Dawco proves arise merely from the differing site conditions and from specific documented figures on derivative expenses, such as overhead, from which the equitable adjustment can be calculated ("actual costs"), and the court may not estimate damages by the "jury verdict method." Damages are to be determined accordingly.

## COSTS

Each party shall bear its own costs.

AFFIRMED-IN-PART, REVERSED-IN-PART, AND REMANDED.