**WALLACE O'CONNOR INTERNATIONAL, LTD., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 532–89C.

United States Claims Court.

Aug. 28, 1991.

Donald O. Pratt, Forth Worth, Tex., attorney of record, for plaintiff. Paul H. Sanderford and Gandy, Michener, Swindle, Whitaker & Pratt, of counsel.

Richard E. Rice, Washington, D.C., with whom was Asst. Atty. Gen., Stuart M. Gerson, for defendant. David M. Cohen, Director, Sharon Y. Eubanks, Asst. Director, and Paula J. Barton, U.S. Dept. of State, of counsel.

## OPINION

FUTEY, Judge.

This government contract case is before the court on defendant's motion to dismiss

for lack of subject matter jurisdiction, or in the alternative, on cross-motions for summary judgment.[1] Plaintiff, an electrical and mechanical subcontractor, alleges privity of contract with the government, and seeks compensation for the alleged retention of proceeds by the prime contractor under "the direction or knowledge" of defendant. Defendant argues that plaintiff advances a claim arising under a subcontract to which the United States was not a party, and alternatively, that plaintiff has not complied with the claim submission requirements of the Contract Disputes Act (CDA), 41 U.S.C. § 601 et seq. In its motion for summary judgment, defendant asserts that plaintiff's retainage claim is legally insufficient.

### Factual Background

On November 3, 1982, the United States Department of State—Office of Foreign Building Operations, awarded Kramico, S.A.E. (Kramico), contract No. 3416–231001, for the construction of a United States Embassy Facility in Cairo, Egypt. Kramico subcontracted most of the electrical and mechanical work on the project to Wallace O'Connor International, Ltd. (WOC).

WOC began work on the project in late 1983/early 1984. Shortly thereafter, WOC notified defendant that Kramico was delinquent in remitting progress payments for work performed on the project. On February 8, 1984, defendant issued Amendment No. 1 to the prime contract in an effort to alleviate Kramico's nonpayment to WOC. The Amendment provided:

The Section 340 of the FM–2 Handbook 1/71 procedure for direct payment of non-Egyptian material suppliers by the Government will be employed for this project and is hereby incorporated into this contract as modified below:

\* \* \* \* \* \*

345.1 The procedure is hereby amended so that the Government shall deduct the direct payments made to suppliers from the Gross Amount Earned in determining the "Amount now due" to the Contractor on the monthly Contract Estimate, Form FS 379A only when the materials corresponding to the payments have been included in the Gross Amount Earned as materials "on site" within the meaning of Article 47(b) above or incorporated into the structure as approved by the Project Manager. The Contractor shall grant the Government the finance and administrative price credit as described below.

The amendment, therefore, incorporated the State Department "340 procedure" into the Kramico contract. The State Department approved WOC as a "340 supplier" in May 1984.

Section 340 of the State Department FM–2 Handbook "prescribes the procedure under which the U.S. Government undertakes on behalf of government-engaged construction contractors to pay directly to suppliers of building materials and equipment procured in countries other than that in which the project is located." The State Department will use the 340 procedure "upon a determination that significant benefits may be expected to accrue to the U.S. Government." Subparagraph 341.2 of the FM Handbook states that the 340 procedure "parallels commercial letter of credit principles, with posts performing the function of correspondent banks." To this extent, subparagraph 341.3 of the Handbook provides:

In paying a supplier, a fiscal servicing post is acting as a fiscal agent for the construction contractor, performing the same function as a correspondent bank in commercial letter of credit operations. The payment, being for the account of the contractor, is liquidated against the construction contract obligation.

Under the "340 procedure," Kramico was required to negotiate the terms of the purchase order or the equivalent, with WOC. Kramico submitted the subcontractor invoice to the State Department for approval. The State Department then sent WOC a letter guaranteeing the subcontractor pay-

---

**1.** This case is related to *Egyptian American Bank, S.A.E. v. United States,* 13 Cl.Ct. 337 (1987).

ment for the work.[2] In all, the State Department sent six guarantee letters to WOC for the following amounts:

| | |
|---|---|
| September 25, 1984 | $292,853.30 |
| May 31, 1984 | $618,923.35 |
| June 12, 1984 | $233,681.15 |
| June 25, 1984 | $618,647.76 |
| July 9, 1984 | $ 32,604.04 |
| August 28, 1984 | $149,001.06 |

On January 13, 1985, defendant terminated Kramico for default. The termination notice stated:

Kramico shall immediately discontinue all work on the Project, and shall cause to be discontinued all performance by your subcontractors and suppliers, except such performance as is described below. You should continue to process existing orders for construction materials. *The Government will honor the letters issued under the terms of Amendment No. 1 of the contract guaranteeing direct payments by the Embassy in Cairo to particular subcontractors, and these contractors should be so informed.* [Emphasis added.]

Plaintiff prepared a "Claim for Retainage/Contract Proceeds" on June 22, 1989. In the claim, plaintiff contended that WOC supplied the Embassy project a total of $1,945,710.66 worth of materials of which Kramico retained $112,758.62. Plaintiff asserted that defendant had a duty to "negate Kramico's ability to withdraw retainage from the amount paid WOC under the '340 Procedure.'" Plaintiff, therefore, requested the contracting officer (CO) to render a final decision for WOC in the amount of $112,758.62, plus interest. Plaintiff sent the claim certified mail to the State Department CO on June 23, 1989. The claim was received by Mr. Dickerson, a State Department mailroom employee, on June 28, 1989. The CO never received the WOC claim and, therefore, never rendered a final decision on the claim.

Plaintiff instituted suit in this court on September 29, 1989, seeking $112,758.62 in damages for the alleged contract retainage. Defendant filed a motion to dismiss, contending that plaintiff lacked privity of contract with the government and, therefore, lacked standing under the CDA and the Tucker Act, 28 U.S.C. § 1491, to bring suit in this court. Alternatively, defendant maintained that plaintiff failed to submit a claim to the CO in accordance with § 605 of the CDA.[3] Plaintiff countered that the "340 procedure" created an express contract or an implied-in-fact contract between WOC and the government over which this court may exercise jurisdiction. In addition, plaintiff avers that it submitted a proper claim to the CO. Plaintiff also filed a motion for summary judgment, alleging entitlement to the contract retainage as a matter of law. Plaintiff asserts that the government committed a breach of contract and violated its duty of good faith and fair dealing with WOC in failing to ensure that WOC received full payment for "340 supplies" delivered under the contract. Defendant filed a cross-motion for summary judgment, contending that WOC did not sustain its claimed damages.

## *Jurisdiction*

### I.

It is well established that a subcontractor not in privity with the government cannot advance a claim directly in this court. *United States v. Johnson Controls*, 713 F.2d 1541, 1550 (Fed.Cir.1983). In *Johnson*, the Federal Circuit held that a finding of privity is synonymous with a finding of an express or implied contract with the government. The court cited the Supreme Court decision of *Merritt v. United States*, 267 U.S. 338, 45 S.Ct. 278, 69 L.Ed. 643 (1925), in support of this conclusion. In that case, a subcontractor sued the United States to recover monies the government received from the prime contractor. The Supreme Court concluded:

---

**2.** The letter stated that the United States would make payment of a specified sum to WOC on behalf of Kramico upon approval of "required submittals for this material in accordance with the conditions of Contract No. 3416–231001."

**3.** In its reply brief, defendant withdrew this defense in light of *Dawco Constr., v. United States*, 930 F.2d 872 (Fed.Cir.1991). However, the court will address this argument in the discussion that follows.

Plaintiff cannot recover under the Tucker Act. *The petition does not allege any contract, express or implied in fact, by the government with the plaintiff to pay the latter ...* on any basis. Nor does it set forth facts from which such a contract will be implied. [Emphasis added; citation omitted.]

*Id.* at 340–41, 45 S.Ct. at 279.

■ WOC was an electrical and mechanical subcontractor under a contract between Kramico and defendant. Upon notification of frequent delinquencies by Kramico in remitting progress payments to WOC, defendant entered into an agreement guaranteeing plaintiff payment for materials supplied under the Kramico contract.[4] Under the agreement, defendant made direct payment to plaintiff and received credit for payments made on behalf of Kramico. As such, plaintiff enjoyed payment priority over Kramico and no longer looked to Kramico for remuneration for the performed work. The government dictated the payment terms and procedures, and benefited from plaintiff's continued performance under the contract. In short, defendant assumed responsibility to pay plaintiff "otherwise than through the existing contractual chain." *Johnson Controls v. United States,* 8 Cl.Ct. 359, 367 (1985). The court, therefore, concludes that the "340 procedure" constituted a contractual obligation between defendant and WOC.

In *D & S Universal Min. Co. v. United States,* 10 Cl.Ct. 707 (1986), a contractor brought suit against the United States after the government refused to pay for various quantities of coal delivered under a requirements contract. During contract performance, the subcontractors entered into an agreement with the government whereby defendant would pay the subcontractors directly through a "Special Numbered Account." Under the agreement,

the subcontractors had payment priority over the prime contractor.

Subsequently, the contractor and the government entered into a settlement agreement, which provided for direct payment of all settlement proceeds to the contractor. The subcontractors moved to intervene in the action, contending that the settlement violated their agreement with the government. Both parties opposed the intervention, maintaining that the subcontractors lacked standing to sue the government. The court disagreed, concluding that the agreement between defendant and the subcontractors creating the "Special Numbered Account" constituted a contract over which the court had jurisdiction. The court next determined that the government could not enter into a settlement agreement providing direct payment to the contractor since it had entered previously into a contract with the subcontractors guaranteeing them payment priority.

In accord with *D & S Universal Mining,* plaintiff has standing under the CDA and the Tucker Act to advance a claim for retainage against the government since the government undertook the obligation to pay plaintiff directly for all work performed under the Kramico contract.

### II.

■ The CDA requires that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and *shall be submitted to the contracting officer for a decision.*" [Emphasis added.] 41 U.S.C. § 605(a). The submission of a certified claim to the CO is a jurisdictional prerequisite for review of a claim in excess of $50,000.00. It is undisputed that plaintiff's June 23, 1989, letter and accompanying documentation contain the requisite elements of a CDA claim.[5] Further, the court recognizes that the claim was properly certified.[6] With respect to claim submission,

---

4. In addition, plaintiff received government approval as a "340 supplier" prior to defendant's assumption of Kramico's payment obligations.

5. Defendant provided the court with a copy of plaintiff's "claim" in the appendix of the motion to dismiss.

6. The document is signed by Robert Mason, Senior Vice–President of Wallace O'Connor International, Ltd., and states that the claim is "made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, and that [the] amount requested accurately reflects the retainage and

plaintiff sent the claim, certified mail, to Richard J. Natale, CO for the State Department. As indicated on the return receipt, the claim was received by Mr. Dickerson, a mailroom employee of the State Department, on June 28, 1989. However, the claim was never delivered to the CO.

In *Dawco Constr. v. United States*, 930 F.2d 872 (Fed.Cir.1991), the Federal Circuit rejected the argument that the CO must receive a contractor claim personally in order to satisfy the "submission" requirement. The court determined that transmission of a claim to the CO through an intermediary constituted a "submission" for CDA purposes. In so doing, the court reasoned that the CDA requires only that contractors commit their claims to the CO for a final decision. *Id.* at 880. In the present case, plaintiff mailed the claim to the CO. The claim was addressed properly and received by a State Department employee on behalf of the CO. Dispatch of the claim to the CO with the correct address, therefore, met the CDA "submission" requirement, notwithstanding the fact that the claim did not reach the CO personally. To hold otherwise would allocate the risk of interagency misdirection of mail on the contractor and would require contractors to physically deliver their claims to the CO to ensure compliance with the CDA. Such an untoward result is inconsistent with the statutory language of the CDA and the Federal Circuit's holding in *Dawco*. The court thus concludes that plaintiff submitted its claim to the CO for a final decision. Since the CO did not render a decision within 60 days of constructive receipt of the claim, plaintiff could proceed under the "deemed denied" provision of the CDA and file a direct action on the retainage claim in this court.[7]

---

other contract proceeds for which the contractor believes the government is liable." Defendant does not challenge the certification language or Mr. Mason's authority to execute the certification.

7. Section 6(c)(5) of the CDA provides that "[a]ny failure by the contracting officer to issue a decision on a contract claim within the period required will be deemed to be a decision by the

*Conclusion*

For the foregoing reasons, the court has jurisdiction to entertain plaintiff's claim for contract retainage. However, the court believes it beneficial to defer ruling on the merits of the case until the CO has had an opportunity to review the claim. Accordingly, pursuant to § 6(c)(5) of the CDA, the CO is directed to render a final decision within 60 days of receipt of the claim. The court will suspend consideration of the parties' cross-motions for summary judgment until the CO issues a final decision on said claim.

contracting officer denying the claim and will authorize the commencement of … suit" in the Claims Court or board of contract appeals. The contracting officer (CO) had constructive receipt of the claim on June 29, 1989. Plaintiff filed suit in this court on September 29, 1989, well over the 60-day period in which the CO was required to decide the claim.