**The BOEING COMPANY, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 92–69C.**

United States Claims Court.

Aug. 28, 1992.

James J. Gallagher, Los Angeles, Cal., for plaintiff.

Martha H. DeGraff, with whom were Asst. Atty. Gen. Stuart M. Gerson and David M. Cohen, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

This is an action brought pursuant to the Contract Disputes Act of 1978 ("CDA").[1] Plaintiff asserts that it submitted two claims pursuant to the Act, and that those claims are properly before the court. The government has moved to dismiss on the ground that there is a failure of subject matter jurisdiction. For the reasons that follow, the motion is granted.

### FACTUAL BACKGROUND [2]

The Air Force awarded Boeing three of five contracts generated in connection with the Peace Shield Program, an air defense, command, communication, and control system for the Kingdom of Saudi Arabia. The largest of Boeing's contracts, not the one at bar, related to furnishing "Prime Mission Equipment," and hence is referred to as the PME contract. The contract that is the subject of this complaint, number F04606–85–C–0286, is known as the Con-

---

1. 41 U.S.C. §§ 601–613 (1988).

2. The facts, which are uncontested, are drawn from the complaint and the materials attached

to the motion. The motion is advanced under RUSCC 12(b)(1).

tractor Technical Services contract ("CTS contract"). It called for Boeing to provide initial operation and maintenance of the Prime Mission Equipment, on-the-job training of the Saudi Air Force personnel who would be responsible for operating the system, and support services for personnel working in Saudi Arabia on other Peace Shield contracts. The CTS contract, awarded February 25, 1985, stated that many of the services to be provided were in support of the PME contract.[3]

Work commenced on all three contracts, but on February 12, 1987, Boeing received a partial stop-work order on the CTS contract asserting that work on the other contracts had fallen behind schedule. The order notified Boeing that the government would request a proposal for cost and schedule impact once a more accurate assessment of program slippage was available.

The stop-work order was modified November 3, 1987, and was finally cancelled November 2, 1988. Upon cancelling the stop-work order, the government instructed Boeing to proceed in all areas of performance of the contract. Immediately prior to the cancellation of the partial stop-work order, the government issued a preliminary copy of a Revised Request for Proposal— Contemplated Supplemental Agreement for the CTS contract. The draft proposed a revised statement of work. Boeing began preparing Contract Change Proposal 0001 in response.

On April 11, 1989, the government informed Boeing that the CTS contract should be completed according to the modified completion schedule then in place for the PME contract. Full operational capacity for the PME contract had initially been called for within 71 months of contract award. Various delays had caused the time for contract completion to be extended to 84 months.

By letter dated April 4, 1990, the government asked Boeing to submit a replan proposal (TCP0135) to cover all Peace Shield contracts. It was to include new schedules, repricing, and revised terms and conditions for all three contracts. The portion pertaining to the CTS contract, TCP0135–2, was to rebaseline the CTS contract, and increase the scope of work. Boeing's Replan Proposal was submitted on May 19, 1990. Plaintiff asserts that $284,900 was the proportionate share of preparing the replan proposal as to the CTS contract. The entire replan proposal was later rejected.

Work on the PME contract apparently continued to run behind schedule. Negotiations between Boeing and the government regarding performance schedules and pricing schemes thus continued throughout the next several months. On October 16, 1990, the parties agreed to work toward another revised schedule plan known as the "MAC 96/113"[4] that was being discussed with respect to the PME contract. This plan set a completion date in early 1993.

Boeing believed both parties had accepted in principal the 96/113 MAC replan. However, on November 29, 1990, the contracting officer ("CO")[5] sent Boeing a "Cure Notice" stating that performance of the CTS contract was considered to be in jeopardy because Boeing was behind schedule on the MAC 67/84 plan on the PME contract. Boeing responded on December 20, 1990, stating its belief that the MAC 67/84 plan had become non binding because of government-caused delays.

---

3. The PME contract and a third contract providing for Air Training Command, have been the subject of litigation in this court. *Boeing Co. v. United States*, 26 Cl.Ct. 529 (Cl.Ct.1992) (dismissed for lack of subject matter jurisdiction); *Boeing Co. v. United States*, 26 Cl.Ct. 257 (Cl.Ct. 1992) (government's motion to dismiss denied; contracting officer's inaction constituted a denial of claim, thus jurisdiction properly invoked; case later remanded to contracting officer for decision within 190 days).

4. "MAC" is an acronym for Months After Contract. MAC 96/113 refers to 96 months after award of the primary contract.

5. There was an Administrative Contracting Officer and later a Termination Contracting Officer. The issues do not turn on their specific authority. The court therefore refers to them collectively as "CO."

On January 10, 1991, concurrent with the issuance of a decision partially to terminate the PME contract for default, the CO issued a stop work order on all work under the CTS contract except that necessary to support what remained of the PME contract. Boeing maintains that although the parties had formally adopted the MAC 67/84 schedule with respect to the PME contract, no formal modification had been made to the CTS contract. Thus, according to Boeing, no enforceable schedule existed for the CTS contract.

On January 31, 1991, the CO issued a final decision partially terminating the CTS contract for default. Certain line items were terminated completely while others were to continue. In the letter, the government stated its position that the CTS contract took its schedule from the PME contract schedule because the CTS was supportive of and therefore dependent on the PME contract work schedule. The notice stated that "[t]he value of the continued and partially terminated work is not definitized at this time." On October 29, 1991, the CO requested from Boeing a proposal for negotiating firm-fixed-prices on the nonterminated portions of the CTS contract.

Boeing made requests for Progress Payments 2A–9090842, 3A–9090932, and 4A–9091017 on January 28, 1991 for work under both the terminated and nonterminated parts of the CTS contract. On February 17, 1991, the CO denied Boeing's request for progress payments for work performed under the terminated portion of the CTS contract.

In a letter delivered November 25, 1991, Boeing submitted a certified Termination for Convenience ("TFC") Settlement Claim with respect to the CTS contract. Boeing sought to have the default termination converted to a termination for the government's convenience. Boeing estimated the "aggregate net payment" to which it was entitled to be $140,203,709, but said that it would alter the amount as it acquired additional documentation. The cover letter to the claim reflects that it was prepared "on a total cost basis, as prescribed by FAR 49.206–2." This was because the "preparation of an inventory basis proposal was not practicable and would have unduly delayed settlement." Furthermore, because "no contract price currently exists, the settlement claim does not recognize any projected liquidations for the nonterminated portion of the contract. When a price is established as a result of the on-going repricing effort and stand-alone claims mentioned above, the settlement claim will be adjusted accordingly." Finally, Boeing requested a decision within 60 days.

In response to Boeing's TFC claim, the CO sent a letter dated January 23, 1992, reciting that he would not issue a decision within 60 days because more information was needed before he could meaningfully review Boeing's claim. The letter requested clarification of the amount of the claim, and more specifics on the contract line items ("CLINs") affected by the allegedly improper termination. The CO drew Boeing's attention to FAR 49.206–2, which states that partial termination for convenience claims submitted on a total cost basis must await work completion. The CO informed Boeing that if the information was provided, "I will respond within sixty days or advise you when I will be able to respond."

In a letter dated November 12, 1991, Boeing submitted a proposal for TCP0135 to be added as a CLIN and sought payment of $284,900 as the cost of the rebaselining effort with respect to the CTS contract. Boeing stated that in view of the government's stated intention (expressed in connection with the response to the progress payment request of January 28, 1991) not to pay any amount under the terminated portion of the contract, Boeing considered the amount already in dispute. The proposal thus was certified as a claim under the CDA, and a response was requested within 60 days.

The CO responded to Boeing's claim concerning TCP0135 on January 9, 1992. The government informed Boeing that it did not consider the amount claimed for preparing TCP0135 to be in dispute. Furthermore, the CO stated he would need more informa-

tion before he could make an informed decision regarding Boeing's allegations.

On January 28, 1992, Boeing sent two letters to the government. In one, it denied that the government needed further information to decide the TFC claim, calling the requested information "unnecessary." The letter concluded by stating that Boeing treated the CO's failure to respond within 60 days as a "deemed" denial of Boeing's claim. The second letter restated Boeing's view that a dispute existed with respect to TCP0135, and it denied that the government needed any more information to make a decision on the claim.

On January 30, 1992, Boeing filed the pending action.

## DISCUSSION

The motion to dismiss raises two issues. The first is whether Boeing's submissions of November 12 and November 25 were claims within the meaning of the CDA. The second is whether the claims should be deemed to have been the subject of a contracting officer decision, since no decision was issued within sixty days of submission. It is unnecessary to resolve the latter issue, however, because the court concludes that no claims were filed.

*The Termination For Convenience Claim*

■ The question raised by Boeing's submission of November 25, is whether the contractor was asking for a sum certain then due it. This requirement is drawn from the applicable regulations, and the decisions of the Court of Appeals for the Federal Circuit. In *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586 (Fed.Cir.1987), the court set a minimal threshold that a claim should meet to precipitate the procedures of the CDA: "All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Contract Cleaning*, 811 F.2d at 592.

In *Dawco Const., Inc. v. United States*, 930 F.2d 872 (Fed.Cir.1991), the Federal Circuit clarified that a claim "must seek payment of a sum certain as to which a dispute exists at the time of the submission." *Id.* at 878. The court pointed to the definition of a claim in the FAR 33.201.[6] At about the same time, in *Overall Roofing & Const. Inc. v. United States*, 929 F.2d 687, (Fed.Cir.1991), the court emphasized the historic limitations on Claims Court jurisdiction in the context of the CDA: "the Claims Court will only entertain suits on claims, and those claims are limited to demands for money presently due and owing." *Overall Roofing*, 929 F.2d at 689.

Was Boeing's submission a clear and unequivocal statement, giving adequate notice of an amount presently due? It was not. The cover letter states that the "aggregate net payment to which Boeing is entitled under the claim is $140,203,709." In the context of a claim for money that is supposedly presently due, this was a peculiar, and in all likelihood, ill-advised use of the word "net." The rest of the claim reveals that Boeing felt it was not possible to use an inventory-based proposal and hence believed it was necessary to proceed on a total-cost basis. This is highly problematic, however, for three reasons.

First, the contract was only partially terminated. Several CLIN's remain to be performed. Second, Boeing recited that "no contract price currently exists." Finally, and no doubt as the inevitable reflection of the first two phenomena, Boeing was unable to price the value of the completed and uncompleted, but nonterminated work until it either reaches an agreement with the government, or performs the rest of the work. The result is that the settlement proposal is merely a formula, with at least one significant unknown. This is clear from the summary calculation of costs claimed. After tallying $201,501,357 in costs and profit, Boeing inserted "TBD" for the following subtrahend, "Deduct finished product invoiced or to be invoiced."

---

**6.** That section defines a claim as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain...."

After deducting advance or partial payments of $70,351,301, the proposal reflects a "net payment requested of $140,203,709." But this is not truly a net figure, because it must have redacted from it the value of the nonterminated work.

The lack of clarity as to the amount sought is apparent from the briefing and oral argument. The proposal settlement contains a standard form affirmance that the costs asserted "include only those charges allocable to the terminated portion of this contract." At page seven of its brief, however, plaintiff recites that its claim "was in the amount of $140,203,709, and included all its costs incurred to date under the terminated and nonterminated portions of the contract (such amount was net of all amounts paid to-date) ..." At oral argument, counsel for Boeing attempted to harmonize the apparent contradiction in these recitations. It became clear that Boeing is only seeking $140 million if it cannot strike an agreement with the government on the value of the nonterminated work. If that is the case, however, Boeing would not be making a TFC settlement cost proposal, but would be seeking payment for nonterminated work.

It also became clear that virtually all of the $140 million was attributable to nonterminated work that had been performed. Counsel for Boeing stated at oral argument that the actual amount of the TFC claim would range from "half a million [to] $1 million." In other words, Boeing is in fact only seeking a small but indeterminate fraction of the "net payment requested."[7] In no meaningful sense, therefore, is the $140 million figure a "net" amount. It is a minuend, from which a very substantial, but unknown amount must still be subtracted. The simplest proof of this is that even if the court agreed with plaintiff that the termination for default was improper, the court could not thereupon enter a money judgment.

The court sympathizes with the dilemma faced by plaintiff. If in fact it is impossible to submit a claim for the value of the terminated work and the costs associated with improper default, then plaintiff must either reach a negotiated agreement with the government on the value of the nonterminated work, or it must complete the re-

---

7. The uncertainty of the claim amount is illustrated in the following excerpt from oral argument.

THE COURT: [W]hat I want to know is, from your perspective what is the overall formula? You take this figure, subtract this figure, add this figure, subtract this, and here is what you come up for this claim.

MR. GALLAGHER: To a considerable extent, the costs represented in the $140 million are going to be offset by the amount agreed upon as contract value between the government and Boeing on the repricing proposal.

THE COURT: All right. That is what I want to understand. $140 million represents the work accomplished to date, plus an estimated amount to finish the non-terminated portion, less the amounts that the government has already paid?

MR. GALLAGHER: That is right.

THE COURT: All right. From that you subtract what?

MR. GALLAGHER: From that we are going to subtract the repricing that is agreed to between Boeing and the government establishing an offset to that portion of the costs incurred already, for which there is no contract price.

THE COURT: I'm sorry, run that by me again. You subtract the repricing what now?

MR. GALLAGHER: Subtract the repricing amount which will establish an offset to the portion of $140 million represented by costs incurred for which there currently is no contract value.

That is, I think, explained, Your Honor, in the record at Page 44 of the appendix at Paragraph F where it says, "Actual payments to date are $70,351,301. However, inasmuch as no contract price currently exists, the settlement claim does not recognize any projected liquidations for the non-terminated portion of the contract. When a price is established as a result of the ongoing repricing effort and stand-alone claims mentioned above, the settlement claim will be adjusted accordingly."

THE COURT: Well, all right, that paragraph is the one I want to focus on. What do you mean by a "liquidation for the nonterminated portion of the contract"? Is that both the work previously done and the work to be done on the non-terminated part of the work? I see Mr. Kavanaugh is saying yes.

MR. GALLAGHER: Yes. That is my understanding.

THE COURT: All right. But how are we going to arrive at that figure? That is, through this repricing?

MR. GALLAGHER: That is going to have to be negotiated.

maining portions of the work.[8] The court does not question the ripeness of the underlying dispute as to liability. In this forum, however, the dispute must be monetized with sufficient particularity to allow the court to enter a judgment for a sum certain. It is manifest that for the present that would be impossible, so long as the plaintiff insists it cannot price the terminated portion of the contract.

*The TCP0135 Proposal Preparation Claim*

■ On April 4, 1990, the Air Force instructed Boeing to prepare the rebaselining proposal which became TCP0135. Boeing was to propose a new schedule and new prices for all three of its contracts. On May 19, Boeing did submit such a proposal, and incorporated within it were the cost of preparing TCP0135 itself. The Air Force rejected the rebaselining proposal. Subsequently, Boeing submitted the November 12 letter claiming those costs associated with putting together TCP0135 with respect to the CTS contract. On January 9, 1992 the CO replied, stating that he would not treat the payment request as a CDA claim, because it was not yet in dispute.

Boeing advances two arguments as to why the CO's statement is legally incorrect. First, it contends that by virtue of the rejection of the rebaselining proposal, it follows that the Air Force would not pay for having the proposal prepared. The court disagrees. The court has before it only a few pages of the proposal, but from the description of TCP0135 in the complaint, it is plain that the proposal was an effort by the parties to reach a comprehensive settlement of ongoing difficulties associated with all three contracts. The cost of preparing the proposal was obviously incidental to rescheduling and repricing the

substance of the three contracts. Costs associated with preparing the proposal with respect to the CTS contract were certainly not identified separately.

■ The parties did not submit the government's response to TCP0135. The plaintiff has the burden of proof when jurisdiction is challenged. The court can thus assume that the rejection of the proposal to reschedule and reprice the project did not also specifically anticipate and reject a claim for the cost of preparing the proposal. In the absence of such a statement by the CO, there is no reason to presume that the Air Force would refuse to pay for the apparently extra-contractual work of preparing a proposal at its request.

Boeing's second effort to put the proposal preparation costs into dispute is more circuitous. It begins with the correct but somewhat flabby assumption that the rebaselining effort was "associated" with the terminated portion of the contract. It was also associated with nonterminated portions of the work. But on this languid predicate plaintiff erects the rest of its argument: the CO notified Boeing in letters dated February 17 and February 25, 1991, that the Air Force would only make progress payments for CLIN's clearly identifiable to the nonterminated work; TCP0135 is not clearly identifiable to nonterminated work; therefore, it should be obvious that a request for payment of proposal preparation costs was in dispute.

As the government points out, there are flaws in this analysis. The most obvious is that the February 1991 letters did not refer to the proposal preparation costs. Only by inference could one conclude that it was pointless to request payment for that work. But even such an inference would be mis-

---

**8.** The court asked for additional briefing on the effect of FAR 49.206–2(b)(3), which provides that "when the total-cost basis is used under a partial termination, the settlement proposal shall not be submitted until completion of the continued portion of the contract." Plaintiff's argument that this section is inapplicable to a termination for default rings somewhat hollow. Plaintiff's claim is one for termination for convenience costs. In order to recover them, it must specifically disavow any basis for default termination. It recognized this fact in its November submission: "The claim has been prepared on a total cost basis, as prescribed by FAR 49.206–2." Moreover, the regulation simply recognizes what the court has found in the text. If the contractor believes it cannot segregate from all costs those costs incurred on terminated line items, then it is impossible to assert a claim for money presently due, particularly when there is no contract price.

placed. There could not be a routine progress payment request for the proposal preparation costs. Those costs might be attributable to a constructive change in the contract, but for the present they cannot be tied to a specific, pre-existing CLIN. Boeing conceded as much in its November 12 letter by asking that a new CLIN be created to cover such costs. This was a discrete item of work that was not the subject of an existing CLIN, terminated or not. It was completed and it was done at the request of the CO. There is no reason to assume it would be disputed simply because some of the CLIN's were terminated.

*Dawco* teaches that "a request for payment that is not in dispute when submitted is not a claim for purposes of the Act." 930 F.2d at 878 (citations omitted). Since there had been no refusal to pay for preparation of TCP0135, those costs were not in dispute as of November 12, 1991. That portion of the complaint was thus not the subject of a claim within the meaning of the CDA.

## CONCLUSION

The complaint does not properly invoke the jurisdiction of the court. The request for conversion to a termination for convenience, and for associated costs, does not present a claim for a sum certain. Nor was there a pending dispute as to payment for the cost of preparing TCP0135.[9] Accordingly, defendant's motion is due to be granted. The Clerk is directed to dismiss the complaint. No costs.

---

9. Plaintiff concedes that the relief sought in paragraphs 92, 102, and 120 of the complaint is not independent of the two claims dealt with in this opinion.