# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| BAE Systems San Francisco Ship Repair ) | ASBCA No. 58809 |
| ) | |
| Under Contract No. W912SU-04-U-0005 ) | |

APPEARANCE FOR THE APPELLANT:      Peter B. Jones, Esq.
                                          Jones & Donovan
                                          Newport Beach, CA

APPEARANCES FOR THE GOVERNMENT:      Raymond M. Saunders, Esq.
                                            Army Chief Trial Attorney
                                          CPT Tyler L. Davidson, JA
                                          CPT Harry M. Parent, III, JA
                                          Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE TING

BAE Systems San Francisco Ship Repair (BAE) was awarded a Delivery Order under an existing Multiple Award Task Order Contract for the programmed drydocking, cleaning, painting and repair to the U.S. Army vessel LSV-5. Four weeks before the contract completion date, the contracting officer (CO) directed BAE to replace 24 tie-down sockets known as "cloverleafs" on the main deck of the vessel. The parties were unable to agree on the appropriate price for the additional work. The CO issued a unilateral modification (Modification No. 6) directing BAE to proceed with the work. The government acknowledged that BAE is entitled to an equitable adjustment. The parties remain in dispute on the quantum of adjustment. BAE submitted a certified claim and the CO issued a decision granting an adjustment based upon an estimate prepared by the government's Ship Surveyor. We have jurisdiction pursuant to the Contract Disputes Act, 41 U.S.C. §§ 7101-7109.

## FINDINGS OF FACT

1. In April 2004, the U.S. Army's Northern Region Contracting Center (NRCC) Mission Contracting Division at Fort Eustis, Virginia (the government) awarded an indefinite-delivery, indefinite-quantity (IDIQ) contract – Contract No. W912SU-04-D-0005 (Contract 0005) – to San Francisco Drydock, Inc.[1] (R4, tab 1). The contract, in the estimated amount of over $22 million, was for the programmed and unprogrammed

---

[1] San Francisco Drydock, Inc., became a part of BAE Systems in 2005 and changed its name to BAE Systems San Francisco Ship Repair (tr. 1/106, 3/203).

drydocking, cleaning, painting, repairs and/or modifications of active Army vessels such as Logistics Support Vessels or LSVs stationed on the West Coast of the United States or Hawaii (*id.* at 4). Work would be ordered as task or delivery orders under Contract 0005 (R4, tab 137 at 1).

2. The base period of Contract 0005 ran from the date of award until 30 November 2004. The contract provided for five one-year option periods ending on 30 November 2009. (R4, tab 1 at 2) The events in this appeal occurred during option period two from 1 December 2006 through 30 November 2007 (*id.*). The contract provided that "[t]ask orders under this contract will be issued by the Contracting Officer" (*id.*, note 6), and liquidated damages of $3,626 per day would be assessed if the contractor fails to deliver the supplies or to perform services within the time specified in the delivery order (*id.*, note 8).

3. Section C.0.1.4, Contracting Officer, of Contract 0005 provides: "Contracting Officer is a person with the authority to enter into, administer, and/or terminate contracts, make related determinations and findings and issue delivery/task orders. Only the Contracting Officer has the authority to extend the performance period of the contract and/or delivery/task orders." (R4, tab 1 at 24) CO Kathleen H. Panton (CO Panton) awarded Delivery Order No. 0002 (DO No. 2) to BAE on 27 December 2006 for the programmed docking, cleaning, painting and repairs of LSV-5. The DO was in the amount of $4,889,413.73. (R4, tab 3 at 1, 3) Amendment No. 01 of DO No. 2 established a 120 calendar day performance period from 30 March through 27 July 2007 (R4, tab 6 at 1, 3). DO No. 2 required BAE to perform numerous "Definite" and "Indefinite" items: Definite items were work known to be required; indefinite items were pre-priced items "but it was not known how much of the work would be required" (R4, tab 1 at 24, §§ C.0.1.7, C.0.1.12, tab 137 at 3). DO No. 2, Item 2030 pertained to "Fuel Tanks Cleaning/Inspection"; as bid, it was a $129,338.91 item (R4, tab 3 at 5). DO No. 2, Item No. 2033 pertained to "Hull Cleaning and Painting (Main Deck and Above, External Areas)"; as bid, it was a $430,035.05 item (*id.*).

4. The contract contained the DFARS 252.217-7028, OVER AND ABOVE WORK (DEC 1991) clause. This clause defines "Over and above work" to mean: "work discovered during the course of performing overhaul, maintenance, and repair efforts that is -- (i) Within the general scope of the contract; (ii) Not covered by the line item(s) for the basic work under the contract; and (iii) Necessary in order to satisfactorily complete the contract." The clause provided elsewhere that:

> (c) Upon discovery of the need for over and above work,
> the Contractor shall prepare and furnish to the Government
> a work request in accordance with the agreed-to
> procedures.

....

(e) The Contractor shall promptly submit to the
Contracting Officer, a proposal for the over and above
work. The Government and Contractor will then negotiate
a settlement for the over and above work. Contract
modifications will be executed to definitize all over and
above work.

(f) Failure to agree on the price over and above work shall
be a dispute within the meaning of the Disputes clause of
this contract.

(R4, tab 1 at 350-51) Contract 0005 included DFARS 252.217-7003, CHANGES
(DEC 1991) which provides, in part: "(a) The Contracting Officer may, at any
time...by *written change order*, make changes within the general scope of any job
order issued under the Master Agreement" including "(4) Time of commencement or
completion of the work" and "(5) Any other requirement of the job order." (Emphasis
added) Paragraph (e) of this clause provides that "Nothing in this clause shall excuse
the Contractor from proceeding with the job order as changed." (R4, tab 1 at 340-41)
Contract 0005 also included DFARS 252.243-7001, PRICING OF CONTRACT
MODIFICATIONS (DEC 1991) (*id.* at 329) providing "When costs are a factor in any
price adjustment under this contract, the contract cost principles and procedures in
FAR Part 31 and DFARS Part 231, in effect on the date of this contract apply."

5. Contract 0005 included a provision establishing a fully burdened labor,
G&A, and profit rates for various contract periods. The **"OFFEROR'S FULLY
BURDENED LABOR RATE FOR THE SECOND OPTION PERIOD"** provision
(fully burdened rate provision) provided:

a. Changes are inherent to vessel repair contracts
and should be expected by the Contractors. Offerors shall
include a fully burdened labor rate *to be used in
negotiating changes*. The rate must include all costs for
negotiating changes, including but not limited to, G&A,
overhead, profit, cost of money, etc. The offeror shall
insert rates below that it agrees *to use in negotiating
changes for new or additional work.* [Emphasis added]

For the second option period, BAE inserted $73.50 as its fully burdened labor rate,
8.82% as its G&A rate, and 10% as its profit rate. (R4, tab 1 at 393, tab 3 at 10
(restated in DO No. 2)) The parties disagree whether the provision precluded BAE

3

from charging a differential ($36.75) for overtime labor hours worked to complete the changed work.

## Identification and Pricing of Cloverleafs for Replacement

6. Denny D. Large, Jr., was the CO's representative (COR) and the government's ship surveyor during the LSV-5 maintenance. Mr. Large had served as a watercraft engineer on Army vessels for over 20 years while he was an active duty soldier. (Tr. 3/11) A watercraft engineer is equivalent to a machinist mate on a Navy vessel – one who operates and maintains the machineries of a vessel (tr. 3/155-56). As the ship surveyor, a part of Mr. Large's responsibility was to provide the CO with his estimate of additional work required (tr. 3/190). Section C.0.1.5, Contracting Officer's Representative (COR), of Contract 0005 provides: "A COR is not empowered to obligate the Government for additional work or services beyond items of work listed in the contract or delivery/task orders" (R4, tab 1 at 24).

7. On 15 June 2007, 77 days into DO No. 2, Mr. Large designated 20 deteriorated cloverleafs on the main deck of the LSV-5 for replacement (R4, tab 76 at 3). In response, BAE submitted Condition Found Report (CFR) 234 on the same day requesting technical information, drawings, test criteria, and any known source from which the cloverleafs could be obtained. On 19 June 2007, Mr. Large designated four more cloverleafs for replacement, making a total of 24. (*Id.* at 3) On 21 June 2007, BAE submitted CFR 259 identifying aircraft socket part #F 518-1E as meeting the government's requirement (R4, tab 49 at 3). On 22 June 2007, Mr. Large requested a quote from BAE to accomplish the replacement (R4, tab 76 at 3).

8. By email on 22 June 2007, BAE's project manager Ron Bain forwarded BAE's change order route slip (estimate) for the cloverleaf replacement work (R4, tab 49 at 1-2). The email told CO Panton that "we should act on this quickly as this will have a[n] impact on contract completion date" (*id.* at 1). As of 22 June 2007, project completion was 35 days away. BAE's change order route slip showed that the work required: (1) 2,844 in straight time (ST) labor hours (2,844 hrs. x $73.50 = $209,034.00); (2) $7,312.08 for materials; (3) $350.00 in subcontractor costs; (4) $675.80 in G&A (8.82%); and (5) $35.00 in profit (10%) for a total price of $217,406.88 (*id.* at 2). Mr. Bain's email also attached a quote from Peck & Hale for 20 cloverleafs for $2,900.00 or $145.00 per cloverleaf (*id.* at 4). BAE's estimate was prepared by Mr. Bain. He testified his estimate was based upon input received from "the craft department heads...[on] what it will take them to do their work" (tr. 2/39).

9. CO Panton, accompanied by her attorney, visited BAE's shipyard on 27-28 June 2007. The primary purpose for the visit was to take a firsthand look at piping replacement issues that had developed. (Tr. 3/212) According to Mr. Bain, the

4

parties discussed their cloverleaf estimates and CO Panton orally directed BAE to procure the cloverleafs (R4, tab 76 at 3).

10. In his 2 July 2007 email to CO Panton, Mr. Large said that "[b]ased upon my estimating, I can't see more than 50 hours per cloverleaf which would bring the total labor for the cloverleafs to 1200 hrs at $73.50/hr for a total of $88,200.00." Adding materials ($7,312.08) and G&A ($644.93), Mr. Large came up with an estimate of $96,157.01. This amount was said to include "cropping out and replacing, painting, testing, rigging, etc."[2] (R4, tab 53) Kenneth M. Wahlman, Chief of Watercraft Inspection Branch at Fort Eustis, said in his 2 July 2007 email to CO Panton "This seemed a little high at first, but I then took into account[ing] [for] all the various areas and amount of touch up coating repairs. This looks reasonable now that I've taken a better look at it." (*Id.*)

11. On 3 July 2007, Mr. Large prepared Specification Worksheet No. 47 formally pricing the cloverleaf replacement work at $96,157.01 as the government's estimate (R4, tab 72 at 5). He discussed the estimate with Mr. Bain and BAE's CEO who had some concerns about the estimate. Mr. Large noted in his log on 9 July 2007 that he did not know if BAE was going to agree to sign the worksheet and thus agree to the government's estimated price. (R4, tab 92 at 56)

12. During a telephone discussion between Mr. Bain and CO Panton held on 6 July 2007, they "agreed on a contract extension date of 8/23/07 based on additional growth work for the PWAC and Gray water piping system." Mr. Bain's 7 July 2007 letter stated "The only extension granted to date is for the PWAC and Gray Water Drain systems. Any discussion concerning the Cloverleaf tie downs has not occurred." (R4, tab 76 at 3) CO Panton asked Mr. Bain by email on 11 July 2007 if BAE had ordered the cloverleafs. Mr. Bain's 12 July 2007 reply said that the cloverleafs had been ordered, and he would check and report on their expected arrival date at the shipyard. (R4, tab 64)

13. Mr. Bain's letter of 17 July 2007 to CO Panton acknowledged receipt of Mr. Large's Specification Worksheet (estimate) pricing the cloverleaf replacement work at $96,157.01. The letter advised that BAE expected the cloverleafs to be delivered on 20 July 2007. The letter also advised that BAE's deck preservation work had been impacted six days waiting to negotiate and settle on a cloverleaf modification, and "must now proceed...with basic WI [Work Items] so as not to impact contract completion date of 8/23/07." The letter went on to say when the coverleafs arrived, BAE would provide a revised cost "based on available manpower resources and schedule up date with any additional contract extension required." (R4, tab 76 at 3-4) As of 17 July 2007, with CO

---

[2] Mr. Large's Specification Worksheet No. 47 would later be issued as a part of unilateral Modification No. 6 (R4, tab 72 at 5).

Panton's agreement to extend the contract to 23 August 2013 for only the additional PW/AC and gray water piping work, BAE had 37 days to complete the cloverleaf replacement work.

14. On 18 July 2007, CO Panton received an email from Mr. Large who notified her that he was told by BAE's ship superintendent that "the yard will not be doing the cloverleafs and that Ron Bain has sent a letter to the contracting office concerning this issue" (R4, tab 70). The record does not show Mr. Bain sent such a letter. CO Panton testified that based on this email, she understood that without an agreement on price, a modification needed to be issued (tr. 4/137).

15. On 19 July 2007, CO Panton issued unilateral Modification No. 06 (Mod. No. 6). The modification required four items of additional work pursuant to DFARS 252.217-7028, Over and Above Work: (1) "Additional Ballast Tank Zincs" ($9,473.16); (2) "Additional Walk-In Freezer/Refrigerator Repairs" ($3,118.15); (3) "Main Deck Cloverleaf Replacement" ($96,157.01); and (4) "Additional Chilled Water System Repairs" ($4,716.84). Paragraph c. of Mod. No. 6 provided:

> c. The period of performance is extended twenty-seven (27) calendar days as agreed during our meeting on 28 Jun 07 and e-mail dated 6 July 07 due to additional piping repairs. *All work, including trials and tests, shall be completed by the revised completion date.* The revised period of performance is 30 Mar 07 through 23 Aug 07, a period of one hundred forty-seven (147) calendar days.

(R4, tab 72) (Emphasis added)

16. Unilateral Mod. No. 6 specifically mentioned that the 27-day extension was given "due to additional piping repairs" (finding 15). Since BAE was given until 23 August 2007 to complete "all work...by the revised completion date," we find that the completion date for the cloverleaf replacement work was also 23 August 2007 (*id.*).

17. Attached to unilateral Mod. No. 6 was Mr. Large's government estimate (Specification Worksheet No. 47). His estimate described the scope of work as he saw it as follows:

> 1. The Contractor agree to furnish materials, parts and equipment to crop out and replace 24 deteriorated cloverleafs on the main deck as designated by the Ship Surveyor.

6

2. Installation and welding of new cloverleafs will [be]
done in accordance with manufacturer's recommendations.
3. Perform Non destructive testing on all welds.
4. Perform a satisfactory pull test in the presence of the
Ship Surveyor at 1.1 times the safe working load on one
replaced cloverleaf designated by the Ship Surveyor.
5. Power tool, clean and paint cloverleafs and all disturbed
areas in accordance with TB 43-0144 [.]

(R4, tab 72 at 5)

18. Mr. Large's supervisor signed the Specification Worksheet on 17 July 2007. CO Panton signed it on 20 July 2007, one day before she signed Modification No. 6. (R4, tab 72 at 5) CO Panton testified she could have "misdated" the Specification Worksheet. She testified unilateral Mod. No. 6 was transmitted to BAE on 19 July 2007 at the earliest and 20 July 2007 at the latest. (Tr. 4/14-15) As of 19 July 2007, the contract completion date was 36 days away.

19. On a more detailed level, Mr. Large's Specification Worksheet No. 47 broke down his estimate as follows:

| Quantity | Description | Unit Costs | Extension |
|---|---|---|---|
| 24 ea | Socket Aircraft | $145.00 | $3,480.00 |
| 19 ea | Fire Cloth | $150.00 | $2,850.00 |
| 1 lot | Gas Welding | $325.00 | $ 325.00 |
| 1 lot | Rod, Welding | $375.00 | $ 375.00 |
| 1 lot | Paint | $262.08 | $ 282.08 |
| TOTAL | | | $7,312.08 |

The government's estimate is summarized as follows:

| | | |
|---|---|---|
| Labor | 1200 hrs @ $73.50 | $88,200.00 |
| Material | | $ 7,312.08 |
| 8.82% G&A on Material | | $ 644.93 |
| TOTAL | | $96,157.01 |

(R4, tab 72 at 5)

20. Mr. Large's $88,200 estimate in labor was based upon 50 ST hours for each of the 24 cloverleafs at a ST hourly rate of $73.50 (24 X $50 X $73.50 = $88,200) (tr. 3/143-44). He estimated 3 hours would be required to crop out each cloverleaf with a shipfitter/welder and a fire watch (tr. 3/144-46). He acknowledged moving each cloverleaf could take an hour (tr. 3/147). He estimated it would take

7

8 hours to weld each new cloverleaf into place, and 1 to 2 hours for paint surface preparation and 3 hours for painting with "an hour per cloverleaf for one coat" (tr. 3/147-49). From Mr. Large's estimate and his testimony at the hearing, we find he gave little or no consideration to what turned out to be a significantly more complicated undertaking requiring additional tank cleaning and painting work that had already been accomplished, and repairing damage to the painting that had been accomplished. Despite BAE's expressed concerns, we find that in issuing Mod. No. 6 unilaterally, CO Panton made no effort to determine from BAE to what extent its workforce and schedule would be impacted, and to what extent work BAE already accomplished would have to be redone when she ordered the cloverleaf replacement work late in the vessel's availability.

21. Upon arrival at the shipyard on 20 July 2007, Mr. Large found that BAE's painting subcontractor, Delta Sandblasting Company, Inc. (Delta Sandblasting), had painted the deteriorated cloverleafs selected for replacement. He issued a deficiency report citing BAE's failure to obtain his approval before painting. (R4, tab 76 at 2; tr. 2/91) Mr. Bain's 20 July 2007 email to CO Panton complained that he had not received a response to his 17 July 2007 letter and now had received a deficiency report for accomplishing BWI (Base Work Item). He said there appeared to be a disconnect on the flow of information and sought advice on how BAE should proceed going forward. (R4, tab 76 at 1)

22. In his 20 July 2007 email to CO Panton, BAE's president and general manager said that he "strongly feel[s] that this deficiency report needs to be withdrawn." His email went on to say: "If you want new cloverleaf sockets installed, we need to either settle the job or the Government needs to issue a unilateral direction to proceed with this additional work." He also protested the timing of the government's request:

> With this issue identified near the end of the availability & then dragging on for over a month, we have been forced to proceed with wrapping up the work in that area to not suffer an extensive amount of disruption and delay and fail to complete the job on time.

(R4, tab 80 at 3)

23. According to Mr. Bain, at the 28 June 2007 meeting, CO Panton verbally directed BAE to "go ahead and procure the sockets" but there was no direction to proceed with actual replacement because "[w]e were still in disagreement on pricing" (tr. 2/91-92). He testified that BAE undertook no further planning until it received unilateral Modification No. 6 (tr. 2/95).

8

24. CO Panton's 23 July 2007 reply said that although the parties had not agreed on a price for the cloverleaf replacement work, it was her understanding when she left the room on 28 June 2007 that "BAE would purchase and install the cloverleafs." Her email went on to say "We agreed BAE will be compensated for this work, we just don't agree on the number of hours. I don't understand the disconnect on this issue." (R4, tab 80 at 2)

25. Mr. Bain's 24 July 2007 email to CO Panton reported that BAE had received the replacement cloverleafs on 23 July 2007. His email went on to say that "there was never an assumption that the government did not want cloverleaf's [sic] installed. I believe the disconnect was there was never a settled modification or unilateral change issued to accomplish [the] modification." The email said that BAE anticipated that the new cloverleaf work would damage the existing paint system requiring paint repairs and thus extending contract completion beyond 23 August 2007. Mr. Bain advised that he had assigned a separate charge number for the cloverleaf replacement work which would allow settlement "based on actual cost plus any additional extension cost." (R4, tab 80 at 1)

26. Painting the deteriorated cloverleafs selected for replacement is a minor issue. The incident, however, highlights the problems the government created when it decided to replace the cloverleafs late in the LSV-5's availability. The government did not identify the cloverleafs for replacement until 15 June 2007. By then, BAE had 42 days left to complete the vessel. The CO did not direct BAE to procure the cloverleafs until 28 June 2007. By then BAE had 29 days left to complete the vessel. The CO waited over 3 weeks to issue a unilateral modification for the work, extending the contract completion date by 27 days due to the additional work relating to the piping replacement work, but requiring all other work on the vessel to be completed by 23 August 2007. By then, BAE had 31 days to complete the vessel.

Nature and Scope of Work Required to Replace the 24 Cloverleafs

27. At the time of the LSV-5 overhaul, Russell Giacalone was the vessel's "deck plate superintendent." His assignment was "to be on the deck plates, to make sure the work proceeded in an orderly manner and make sure the job got done." During the overhaul, Mr. Giacalone was on the vessel "every day." (Tr. 1/180-81) Mr. Giacalone testified that he supervised and observed the cloverleaf replacement work during the day shifts and some of the night shifts (tr. 1/190-91). As a supervisor, we find Mr. Giacalone, as the deck plate supervisor, was not involved in the physical removal of the old cloverleafs or the installation of the new cloverleafs or any restoration work required.

28. At the hearing, Mr. Giacalone provided a step-by-step description of the work required to replace the cloverleafs: Initially, the cloverleafs had to be procured.

9

When they were received at BAE's warehouse, they went to the steel shop where they were inspected to ensure they were suitable for use. The cloverleafs were then beveled to "provide a hundred-percent weld." The light coat of paint or preservative was scraped off from the edge "so that they could be welded to...the deck." The cloverleafs were then rigged aboard the vessel. (Tr. 1/181-82)

29. Removal of the old and installation of the new cloverleafs required hot work and welding above and below the main deck where various tanks were located. Some 12 tanks were affected by the cloverleaf replacement work. They were located "[a]ll over the deck of the ship." (Tr. 1/209) There were ballast tanks, fuel tanks and potable water tanks on the LSV-5. More preparation work was needed in the potable water and fuel tanks. (Tr. 1/212) The fuel tanks did not require painting (tr. 1/215). In preparation for installation of the cloverleafs, these tanks below the main deck had to be cleaned. Since BAE had "already worked in some of the ballast tanks and had just come out of them," only some needed cleaning. (Tr. 1/182) There is no evidence that BAE charged the costs of cleaning those ballast tanks already cleaned to the cloverleaf replacement work.

30. BAE's Production Schedule for the LSV-5 showed that, as of 19 July 2007, on which CO Panton issued unilateral Modification No. 06, its work on "FUEL TANK CLEANING AND INSPECTION" (Item 2030) was 98% finished. The same schedule showed that the #2 P/C/S (Port/Center/Starboard) and the #1 Center tanks were 100% complete; and Item 2033 "HULL CLEANING AND PAINTING (MN DK & ABV, EXT AREA)" was 93% complete; only #1 STBD Fuel Oil Tank remained to be done. (App. supp. R4, tab 508 at 3) As of 19 July 2007, no work on the cloverleaf replacement had begun. According to Mr. Giacalone, two fuel tanks were affected by the cloverleaf replacement work. The fuel tanks had to be opened, ventilated, and drained. After the tanks were drained, they had to be checked by a certified person with a meter before laborers, with protective clothing, were allowed to enter. The certification, however, was good for 24 hours, and it had to be updated daily. The fuel tanks were washed and the residues were pumped to a holding tank for disposal. A chemist had to certify that the tanks were safe for hot work. (Tr. 1/186-87)

31. Once the tanks were cleaned, BAE had to "go down and locate the underside of the socket." Rental staging had to be set up "to work 20 feet up in the overhead." (Tr. 1/182-83) Because the tanks had been previously painted when the cloverleaf replacement work began, BAE had to "restage" inside the tanks and hang fire cloth curtains around the bottom of the socket cutout and on the deck to protect the new paint (tr. 1/189-90).

32. BAE also had to locate the cloverleafs on the main deck with a surveyor, and lay out the cut. Welding machines were then set up to cut the old cloverleafs out. (Tr. 1/183) During welding, a welder could require two to three workers acting as fire

watch (tr. 1/197). When a welder was welding a cloverleaf on top of a tank, a fire watch would be posted inside a tank and a fire watch would be posted behind the welder (tr. 1/196-97). When a welder was welding on a bulkhead with a tank on each side, as in the case of one or two cloverleafs, a fire watch would be posted in each space (tr. 1/197). Not only during welding, "[w]henever hot work was going on" such as grinding and burning, a fire watch would be required (tr. 1/197-98). Once the old cloverleaf was cut out, BAE would bevel the deck to fit the cloverleaf. The cloverleaf was then fitted level with the deck and inspected by the surveyor before welding began. (Tr. 1/183-84) The top of each cloverleaf took four welding passes; the bottom was back-gouged to get "a hundred percent weld on the...socket" (tr. 1/184).

33. After the laborers cleaned the tanks for smoke and slag, a vacuum box test[3] on the welds was done. A pull test was then performed on a selected cloverleaf. (Tr. 1/184) Once the vacuum box and the pull tests were done, four coats of paint had to be applied. After removing the staging, the tanks were recleaned and refilled. BAE then had to dispose of the waste water and the debris, and stow away its gear and complete its report. (Tr. 1/184-85)

34. Mr. Giacalone explained that in ordering the cloverleaf replacement work late, BAE was required to redo work that it had already accomplished: (1) "recleaning the tanks"; (2) "extra work in pumping...the fuel tanks a couple of times"; (3) "recleaning ballast tanks"; (4) "pumping the oil back into the fuel tanks"; and (5) stationing associated fire watch (tr. 1/198). In connection with painting, he explained, "we had to...start all over again...to do the painting in the tanks since the tanks had already been painted, we had to go back and retouch up the cloverleafs." Where the paint underneath the cloverleaf installations below the main deck were affected by welding, they had to be repainted. (Tr. 1/209) To minimize fumes, BAE also had to remove paint and grind back some of the paint about four inches around the tanks' underside. After the cloverleafs were installed, four coats of paint had to be applied. (Tr. 1/190)

Ship Surveyor's Record of Cloverleaf Replacement Milestones

35. Mr. Large kept a day-by-day log on BAE's work on the LSV-5. His log indicated that BAE brought staging equipment aboard the vessel on 26 July 2007 in preparation for the cloverleaf work. (R4, tab 92 at 65) His entries prior to 26 July 2007 indicated numerous instances where he received from BAE checkpoint notifications to inspect the fuel, potable water and ballast tanks. This indicates, and we find, that up to this point, BAE had made significant progress in completing the tank work called for by the original contract. (*Id.* at 44-65) Mr. Large's log of 26 July 2007 indicated that BAE was marking patterns on the main deck so that the cloverleafs

---

[3] At the hearing, Mr. Giacalone incorrectly referred to the tests as dye penetrant tests; what were required were vacuum box tests (tr. 3/43).

11

could be installed in the right position (*id.* at 65). It indicated that BAE cut the deck portion of three cloverleafs, and based upon what he was told by a BAE employee, Mr. Large noted that it took about five minutes to cut each cloverleaf (*id.*; tr. 3/32). The government's weekly contract progress report ending 27 July 2007 showed that cloverleaf replacement (Item No. 2033-2) was 10% complete (R4, tab 83 at 11). Mr. Large's log of 30 July 2007 noted that 18 out of the 24 cloverleafs had been cropped out and replaced, and the remaining four cloverleafs were cropped out and replaced over the weekend (R4, tab 92 at 67). By 30 July 2007, contract completion was 24 days away. BAE worked overtime during weekends in an effort to complete the cloverleaf work by 23 August 2007.

36. Mr. Large's log of 1 August 2007 indicated that welding had been completed on three cloverleafs and the welds still had to be tested. His log stated "Appears that there are 3 shipyard workers doing the work for these on the top of the main deck. Cannot say how many are underneath doing the work." (R4, tab 92 at 68-69) After the cloverleafs were welded, they had to undergo a non-destructive test known as the "vacuum box" test to detect cracks in the welding (tr. 3/42, 132). Mr. Large's log of 3 August 2007 indicated he "[w]itnessed vacuum box testing on 10 cloverleafs" and all of them passed the test (R4, tab 92 at 69-70). His log also indicated BAE's ship superintendent stated that the yard intended to have the remaining cloverleafs welded in place and tested by American Bureau of Ships (ABS) by Monday (*id.* at 70). Mr. Large's log of 6 August 2007 indicated "[a]ll cloverleafs are now installed and welded." It indicated the ABS witnessed the vacuum box testing of the remaining cloverleafs over the weekend, and the pull test still needed to be done. (R4, tab 92 at 70; tr. 3/135) BAE provided the equipment to conduct the vacuum box testing (tr. 3/135-36). According to Mr. Large, vacuum box testing of each cloverleaf took five to ten minutes (tr. 3/46). Since a vacuum box testing involved spraying a mixture of soap and water on the welds and the placement of a plexiglass box around the welding to create a vacuum (tr. 3/132), we find that the actual setup, testing, evaluation, and recording of the results could take more than five to ten minutes per cloverleaf.

37. Mr. Large's log of 7 August 2007 indicated that he "[i]nspected [the] remaining cloverleafs for surface prep" and authorized BAE to paint (R4, tab 92 at 71). His log of 8 August 2007 indicated he witnessed a pull test on one cloverleaf and saw "[n]o signs of welds cracking" (*id.* at 72). He testified the pull test on one cloverleaf took about an hour and a half (tr. 3/47-48). His log indicated that the underside of the cloverleaf had to be checked "to insure that those welds did not crack" (R4, tab 92 at 72). Although the pull test could be conducted in an hour and a half, we find the setup and getting the right people involved and the subsequent documentation took far more than an hour and a half.

38. Mr. Large's log of 9 August 2007, indicated he inspected the underside of the cloverleafs in various areas of the vessel and found the paint looked good and only a few cloverleafs needed a final coat. Mr. Large also witnessed the vacuum box test on the remaining cloverleafs and found no problems. (R4, tab 92 at 73; tr. 3/48)

39. Mr. Large's log of 9 August 2007 indicated that blasting of the main deck had started. Only a portion of the main deck could be blasted because BAE still had equipment on the deck. (R4, tab 92 at 73) Painting of the main deck had not started (tr. 3/49). Mr. Large's log of 10 August 2007 indicated that the "[f]orward 1/3 of the deck was painted overnight" and "[b]lasting of the mid 1/3 of the main deck has started" (R4, tab 92 at 73).

40. Mr. Large's Weekly Progress Report ending 17 August 2007 indicated that BAE started the cloverleaf replacement work on 3 July 2007[4] and completed the work on 15 August 2007. In terms of progress, the report indicated that BAE completed 10% of the work as of 27 July 2007, 60% of the work as of 3 August 2007, 80% of the work as of 10 August 2007, and 100% of the work as of 17 August 2007. (R4, tab 89 at 11) Mr. Large testified that as of 17 August 2007, all of the new cloverleafs had been welded in place and the underside of the cloverleafs inside the tanks had been completed (tr. 3/54). He explained that the percentage of completion did not include painting of the deck which was under a separate work item (tr. 3/54-55).

41. Mr. Large's log of 17 August 2007 indicated dock trial began at 7 a.m. (R4, tab 92 at 77). On that day, Mr. Large inspected the ballast tanks and found the painters were still in the tank and the paint was still wet. Mr. Large noted "[T]he burnt areas had not even been touched. They still need to be power tooled, primed and painted." (R4, tab 92 at 78) Based on Mr. Giacalone's testimony, we find that BAE had painted the tanks (except the two fuel tanks) before it started the cloverleaf replacement work (finding 34), and that work required BAE to paint the tanks a second time. Sea trial took place on 20 August 2007 (id. at 78). Both dock trial and sea trial were required under the original terms of the contract (see R4, tab 1 at 134-35, ¶¶ C.43.4., C.43.5.). Mr. Giacalone participated in the dock trial and the sea trial (tr. 3/57, 61). When asked whether any cloverleaf work took place during dock trial, he testified "probably not." When asked whether any cloverleaf work took place during sea trial, he testified "[p]robably not. At least not on the ship." He testified on that day, he "[w]ent out in

---

[4] Considering that BAE did not receive the cloverleafs until 23 July 2007 (finding 25), and it did not bring staging equipment aboard the vessel until 26 July 2007 (finding 35), the record is unclear what work was conducted to warrant a finding that the cloverleaf replacement work was 10% complete as of 3 July 2007.

13

the bay and then puttered around for about most of the day."[5] (Tr. 1/226)

### BAE Ship Superintendent's Record of Cloverleaf-Related Work through 25 August 2007

42. In response to the Defense Contract Audit Agency's (DCAA's) request during the course of an audit of its claim, BAE ship superintendent Mr. Giacalone provided a summary from his records showing that the cloverleaf replacement work was not completed until 25 August 2007: On 15 August 2007, he supervised the preparation and priming of the cloverleafs. On 16 August 2007, he supervised the preparation, priming, and painting of cloverleafs inside the tanks, and the cleaning of the inside of the ballast tanks before closing them. On 17 August 2007, he supervised the cleaning of ballast tanks, the transferring of fuel, and the application of the third and fourth coats of paint to the undersides of the cloverleafs inside the tanks. On 18 August 2007, he supervised the closing and filling of the potable water tank, the touching-up of smoke damage inside the ballast tanks, and the preparation and priming of the topside of the cloverleafs for painting. On 19 August 2007, he supervised the chlorination and pumping of the potable water tanks, and the cleaning and closing of the #2 ballast tanks. On 20 August 2007, he supervised the filling and re-chlorination of the potable water tanks. On 21 August 2007, he supervised the draining and refueling of the potable water tanks, the closing and filling of ballast tanks, the recleaning of potable water and ballast tanks after staging was removed, and the application of the second coat of paint to the topside cloverleafs. On 22 August 2007, he supervised the draining and filling of the potable water tanks, the closing and transferring of fuel to the fuel tanks, the application of the third and fourth coats of paint to the topside cloverleafs, and the touching up of smoke damage inside the tanks. On 23 August 2007, he supervised the draining, filling, testing, and cleaning of potable water tanks, the transferring of fuel, and application of the fourth coat of paint to the remaining cloverleafs. On 24 August 2007, he supervised the filling and closing of potable and ballast tanks, the transferring of fuel to holding tanks, and the removal and transportation of gears from the vessel. On 25 August 2007, he supervised the cleaning and stowing of equipment and the disposition of hazmat from the vessel. (R4, tab 139, subtab 48) Based on Mr. Giacalone's summary, we find BAE completed the cloverleaf replacement work on 25 August 2007.

43. Except for challenging Mr. Giacalone's involvement beyond his supervisory capacity, the government did not seriously challenge the work detailed in Mr. Giacalone's testimony or his statement as not having occurred, or not being caused by or related to the cloverleaf replacement work. It is undisputed that BAE completed the installation, testing

---

[5] This does not mean that Mr. Giacalone was not supervising the filling and re-chlorination of the portable water tanks on 20 August 2007 as the government's brief suggests (*see* gov't br. at 36, ¶ 111).

14

and painting of the new cloverleafs and restored the various tanks under the main deck affected by that work.

44. Based on Mr. Giacalone's testimony, we find that BAE had painted the affected tanks underneath the main deck, except for the two fuel tanks which did not require painting, before it started the cloverleaf replacement work (finding 34). Based upon Mr. Giacalone's statement provided to DCAA, we find during the period from 15 to 25 August 2007 BAE continued (1) to paint the replacement cloverleafs above and below the main deck; (2) to repaint already painted potable water and ballast tanks below the main deck; and (3) to restore the affected tanks below the main deck affected by the replacement work. We find BAE completed the cloverleaf replacement work on 25 August 2007, two days after the completion date unilaterally imposed by Modification No. 6.

Submission of BAE's REA and Certified Claim

45. By email on 8 October 2007, Mr. Bain sent CO Panton his revised pricing on "Mod # 6 and # 7." BAE's submission showed a revised price of $394,094.50 for the cloverleaf replacement. (R4, tab 96 at 1-2) CO Panton's 29 November 2007 response said she understood BAE's claim to be based upon actual incurred costs and asked BAE to provide a breakdown of the costs for each of the five areas claimed (R4, tab 98 at 1).

46. In its 8 July 2009 letter to CO Panton, BAE submitted an omnibus Request for Equitable Adjustment (REA) (R4, tab 103 at 3-5). Section 3 of the REA sought $394,094.50 for the additional work performed to procure and install 24 cloverleafs. The letter contended that BAE had provided the government an estimate to perform the new work but the government "did not provide [BAE] the opportunity to discuss and negotiate the price proposal submitted" but "issued a Unilateral Contract Modification...directing [BAE] to crop out and replace the deteriorated Cloverleaf Tie Down Sockets." The REA said that it "performed the new work based on the unilateral direction." (R4, tab 104 at 2) The REA attached a Change Order Route Slip detailing the elements of its $394,094.50 claim (id. at 3).

47. In response to BAE's 8 July 2009 REA, CO Panton's 30 March 2010 letter noted that BAE began work on the cloverleafs on 25 July 2007 and began assembling staging on 26 July 2007. Her letter said that on 27 July 2007, BAE spent roughly five minutes to cut out each of the three cloverleafs and "[d]uring this period, the COR observed that there were three BAE employees working on the cloverleafs." She noted further that BAE installed and welded all 24 cloverleafs by 6 August 2007, and they were inspected and accepted on 10 August 2007. On the $394,094.50 BAE sought, CO Panton said that the claim was not substantiated. She asked for evidence that BAE spent $17,540.40 in materials, and over 7,000 hours in labor. CO Panton

said "Based on similar work at other contractor facilities, I have determined that BAE was generously compensated and no additional money is due." (R4, tab 109 at 4)

48. BAE's 3 June 2010 letter provided a point-by-point response (R4, tab 112). On the COR's observations, BAE said that they did not capture the entire work effort required to perform the cloverleaf replacement work. BAE contended that the shipyard performed work both in the shop and aboard the ship, and the COR's limited deck plate observations did not take into account "shop related work, mobilization, setup, tear down, equipment preparation or tool check out time." BAE said that removal of the cloverleafs was the simplest part of the work, and "[a] majority of the work requires hours of grinding and weld preparation with welding that occurs on the deck as well as in the overhead of the affected space. All hot work also requires fire watch services in the space below." (*Id.* at 2) On the CO's contention that other shipyards had replaced at much lower prices, BAE explained "what may be an acceptable charging practice...in one shipyard...may or may not be so in another shipyard under a different contract." BAE maintained that "[e]ach shipyard may have unique contract requirements and pricing practices that are affected by...state laws...OSHA regulations, port requirements, cost collection centers and rate structures." (*Id.*)

49. Based upon further review of its job order labor status report, BAE's 3 June 2010 response reduced its labor hours claimed from 4,392 to 4,103 hours, with 1,408 hours charged at an overtime differential. BAE attached documentary support for $12,710 in materials and for subcontractor cost (R4, tab 112 at 9, 74). With G&A and profit, BAE modified its actual incurred cost claim to $375,701. With $96,157 allowed and paid[6] by the government, BAE claimed it was due $279,544 ($375,701 - $96,157). (*Id.* at 3)

50. By letter dated 11 July 2011, almost four years after completion of the LSV-5 contract, BAE submitted a certified claim to the CO. The claim sought $381,258. With the $96,157 the CO allowed and paid, BAE sought an additional $285,101:

---

[6] According to the government's brief, it paid the $96,157 (gov't br. at 80, 86). BAE did not contend otherwise.

| | |
|---|---|
| 4,102.5 hours @ $73.50 | $301,534 |
| 1,407.50 hours of OT @ Differential $36.75 | $ 51,726 |
| Material: 24 Cloverleafs (Invoice Attached) | $ 3,480 |
| Other (Material Status Report Attached) | $ 12,710 |
| Subs | $ 7,200 |
| G&A @ 8.82% of Material and Subs | $ 2,063 |
| Profit on Material and Subs @ 10% | $ 2,545 |
| Total Equitable Adjustment Due | $381,258 |
| Less Allowed and Paid by Unilateral Mod. 06 | $ 96,157 |
| Additional Equitable Adjustment | $285,101 |

(R4, tab 121 at 1-2) (Emphasis added)

BAE's Accounting System

51. For management and record keeping purposes, BAE maintains what it refers to as a "Job Cost Accounting System" (tr. 1/90). The accounting system applies to every job in the shipyard, whether commercial or government work (tr. 1/91). Fundamentally, BAE's Job Order Accounting System has two sides: On the labor side, the system "collect[s] hours that are worked by the employees that are charged to various projects and items." On the material side, purchase orders are filled out and approved, and "material costs to be charged to various projects and items" are collected. (Tr. 1/90) This Job Order Accounting System was in place during LSV-5's programmed maintenance.

52. BAE's Job Order Accounting System produced Job Order Status Reports (R4, tab 112 at 4). A Job Order Status report shows "the number of hours on a particular project" (tr. 1/95). The Job Order Status Report for the cloverleaf replacement work was assigned the account number of 43631.3002 (Account 3002). The first number – 43631 – designated vessel involved; the second number – 3002 – designated the "subproject," in this case the cloverleaf replacement work. The Job Order Status Reports were the products of the same computer system in which employee timesheets were entered. (Tr. 1/68, 95-96)

53. Under BAE's Job Order Accounting System, a timesheet was filled out daily by supervisors for each hourly employee and it was submitted daily to the payroll department for entry into BAE's computer system (tr. 1/92, 94). The timesheets served two purposes: (1) "for the employees [to] get paid"; and (2) "for the hours to be allocated to the correct project and item number that [the employees were] working on" (tr. 1/92). The supervisors entered the hours on the timesheet; they also determined the job and the item "to which each employee's time [was] attributable"

(tr. 1/93). Timesheet information was entered into BAE's computer system by BAE's payroll supervisor (tr. 1/94).

54. To purchase material, a purchase order (PO) would be filled out by a supervisor. The project/item description number (e.g., 43631.3002) would be entered in the description box (*see* R4, tab 112 at 37; tr. 1/103). The PO would then be entered into BAE's computer system by a purchasing employee (tr. 1/103). The computer would then enter the material procurement into BAE's Material Status Report (*see* R4, tab 112 at 5).

55. Subject to entry and judgmental errors which occurred from time to time, we find that BAE had a structured and reliable cost accounting system in place for collecting and allocating actual costs incurred for changed work.

DCAA Audit

56. On 28 October 2011, CO Panton asked DCAA to audit BAE's (1) $285,101 claim relating to the replacement of 24 cloverleafs and (2) $903,973 claim relating to the replacement of the vessel's piping system (R4, tab 129 at 3). DCAA auditor William P. Bernacchi was assigned to conduct the audit. He acknowledged he lacked the technical expertise to make technical evaluations. He testified he did not ask for technical assistance. (Tr. 1/73). The record does not indicate the government made available anyone with technical expertise, like Mr. Large, to help.

57. Where overtime (OT) hours were worked, they were claimed at a differential of $36.75, half of the rate of $73.50. During the audit, Mr. Bernacchi by email on 11 June 2012 asked Rick Brandt, BAE's controller, whether there was any documentation authorizing overtime. The email stated "If not, the contracting authority may have to issue one retroactively."[7] (R4, tab 139, subtab 29 at 2)

58. Mr. Brandt's 12 June 2012 email replied:

> As far as I know, there is no requirement in the LSV-5
> contract for Government authorization of overtime.
> For the cloverleafs, REA 006, the Government unilaterally
> ordered the work and set the delivery schedule.

---

[7] FAR 22.103-4(a), APPROVALS (JAN 2003) authorizes overtime to "(1) Meet essential delivery or performance schedules"; and (2) "Make up for delays beyond the control and without the fault or negligence of the contractor." FAR 22.103-4(i) provides "Approvals for using overtime shall ordinarily be prospective, but, if justified by emergency circumstances, approvals may be retroactive."

18

We believe that if O/T was necessary to complete the work within schedule, that it is recoverable.

(R4, tab 139, subtab 29 at 2) Mr. Bernacchi testified that he did not receive from CO Panton anything indicating that overtime hours were not appropriate or allowable (tr. 1/35). When asked why she disallowed overtime, CO Panton testified that BAE agreed to a fully burdened rate of $73.50 per hour to perform changes, and its contract was a "calendar day" not a "Monday through Friday" contract and "[i]t's up to the contractor...to plan their time." (Tr. 4/45, 46)

59. During the audit, Mr. Bernacchi asked CO Panton by email on 7 March 2012 whether he would be correct that no costs claimed for REA No. 6 should be allowed for dates later than 10 August 2007. He reported that "[a] number of hours including overtime hours worked on Saturdays and Sundays are later than August 10." (R4, tab 139, subtab 12 at 2) CO Panton's 14 March 2012 email reply said "According to the COR, and the final weekly progress report, the work on the cloverleafs (REA No. 6), to include all testing, was 100% complete on 15 Aug 07" (*id.* at 1).

60. Although the cloverleafs were welded and tested before 10 August 2007, the evidence developed at the hearing demonstrated that painting of the cloverleafs, repainting, recleaning and refilling of the underdeck tanks affected by the cloverleaf replacement work, including final cleanup, stretched out until 25 August 2007 (SOF ¶ 44). In relying upon Mr. Large's report, we find CO Panton failed to consider the impact of the cloverleaf replacement work upon unchanged work.

61. DCAA issued Audit Report No. 4281-2012W17200001 on 31 August 2012 (R4, tab 129). The report said that its primary purpose was to "review the quantum aspects of the claim" and "assumes BAE Systems SFSR can demonstrate legal entitlement" (*id.* at 3 of 16). Mr. Bernacchi testified that BAE's accounting system "appeared to be consistent with normal business practices for that environment" (tr. 1/23-24). The audit did not question any of the cloverleaf claimed costs in BAE's certified claim (R4, tab 129 at 5 of 16).

(a) *Labor Rates, Labor Hours and Labor Cost*

62. DCAA found the labor rate BAE claimed was based upon the fully burdened rate of $73.50 as set out in the contract for Option Period 2, and BAE's proposed overtime labor rate of $36.75 was half of the ST labor rate (R4, tab 129 at 6 of 16). On the labor hours claimed, the DCAA report said that DCAA was able to reconcile "the proposed labor hours from the claim to the labor distribution report" for REA No. 6. DCAA was able to "selectively trace[]...[employee labor charges] to the labor distribution report" for REA No. 6. (*Id.* at 6-7 of 16) As a result of its

19

examination, DCAA took no exception to the "proposed labor cost, labor hours and labor rate" for the cloverleaf replacement work (*id.* at 6 of 16). DCAA also took no exception to the proposed overtime labor hours for the cloverleaf work. It recommended that the CO consult FAR 22.103(a-i) for alternatives available for settlement on overtime compensation. (*Id.* at 10 of 16)

### (b) *Materials*

63. With respect to the material costs BAE claimed, DCAA found that they were based on (1) purchase orders; (2) vendor records of delivery; and (3) records of vendor payments made by BAE. The report said DCAA was able to reconcile the $16,190.00 for materials claimed to BAE's purchase orders, vendor delivery records and records of vendor payments by BAE. Based on its examination, DCAA took no exception to the material costs BAE claimed for the cloverleaf replacement work. (R4, tab 129 at 7 of 16) According to Mr. Bernacchi, "Originally the materials purchased after 8/25/07 were thought to be purchased out of period. However, BAE provided documentation that supported the environmental expenses being incurred out of period," and "[a]ll materials are supported by vendor invoices." (R4, tab 140, subtab I-2 at 1-02 (1/1))

### (c) *Subcontractor Costs*

64. With respect to the $7,200 in subcontractor costs, the DCAA report states that BAE provided a vendor invoice and record of payment to support its claim (R4, tab 129 at 7-8 of 16).

### (d) *General & Administrative Cost*

65. The DCAA report found that BAE's G&A was based upon the negotiated rate of 8.82%, and the rate was applied to material and subcontractor costs. DCAA took no exception to the $2,063 claimed for G&A on the cloverleaf work. (R4, tab 129 at 9 of 16)

### (e) *Profit*

66. DCAA found BAE correctly applied the 10% profit rate to materials ($16,190) and subcontractor ($7,200) costs and G&A cost. It took no exception to the $2,545 profit claimed for the cloverleaf work. (R4, tab 129 at 10 of 16)

### Labor Hours Allowed and Disallowed

67. During DCAA's audit, BAE provided its labor distribution report (R4, tab 139, subtab 56). This report listed by trade, by date, each employee's ST and OT

labor hours charged to the cloverleaf replacement account – Account 3002 (*id.* at 17-43). This report showed BAE charged 4,102.50 ST hours to replace the cloverleafs. Of these ST hours, 1,407.50 were OT hours. (*Id.* at 43)

68. Based upon our finding that the cloverleaf replacement work was completed on 25 August 2007 (SOF ¶ 44), and based upon a lack of explanation for the labor hours charged to Account 3002 after that date, we disallow all labor charges claimed after 25 August 2007 with one exception: We find the 32.50 ST labor hours for Trade 426, Environmental Labor, charged to Account 3002 between 28 August and 18 September 2007 are allowed in recognition that wastes and hazmat from the cloverleaf work were disposed after 25 August 2007.

69. BAE's labor distribution report showed that ship superintendent Mr. Giacalone charged 8 ST hours on 17 August 2007 when dock trial took place, and 8 ST hours on 20 August 2007 when sea trial took place (R4, tab 139, subtab 56 at 26). When asked about these hours, Mr. Giacalone testified that he spent "anywhere from four hours to eight hours" on dock trial but did not say what cloverleaf work was involved. On the day of the sea trial, he testified that he "[w]ent out in the bay and then puttered around for about most of the day." (Tr. 1/226) Without proof that he performed cloverleaf work chargeable to Account 3002, we disallow 16 ST hours charged on 17 and 20 August 2007 to that account. For the same reason, we disallow 2.5 and 3.5 OT hours Mr. Giacalone charged to Account 3002 on 17 and 20 August 2007 respectively. (R4, tab 139, subtab 56 at 26, 29)

70. BAE's labor distribution report shows that outside of (1) 17 and 20 August 2007 discussed above, and (2) the period after 25 August 2007, Mr. Giacalone charged Account 3002 for 8-hour and 16-hour days for a total of 160 ST hours (R4, tab 139, subtab 56 at 26). Since Mr. Giacalone was the deck plate superintendent with other responsibilities, and since he was not physically involved with the actual removal and installation of the cloverleafs and associated work, we allow 2 out of every 8 hours each day or 42 ST hours as cloverleaf-related supervision work allocable (thus disallowing 126 ST hours) to Account 3002. We apply the same formula to the remaining 65.50 OT hours charged to Account 3002 and allow 16.5 OT hours (thus disallowing 49 OT hours).

71. From the total 4,102.5 ST hours and 1,407.5 OT hours BAE charged to Account 3002 for the cloverleaf replacement work, we summarize as unallowable the following ST and OT hours:

21

| Trade Code | Trade | Hours Disallowed | R4, tab 139-56 Reference |
|---|---|---|---|
| 413 | Program Mgmt. | 80 ST hours (after period, 8/26-9/7, 2007) | 26-27 |
| 413-OT | Program Mgmt. | 12.5 OT hours (after period, 8/26, 29, 30/2007) | 29 |
| 413 | Program Mgmt. | 16 ST hours. Giacalone (8/17, 8/20, 2007) | 26 |
| 413-OT | Program Mgmt. | 6 OT hours. Giacalone (8/17, 8/20, 2007) | 29 |
| 413 | Program Mgmt. | 126 of 168 ST hours (Giacacone, other supervisory duties) | 26, 27 |
| 413-OT | Program Mgmt. | 49 of 65.5 OT hours (Giacalone, other supervisory duties) | 29 |
| 402 | Paint | 24 ST hours (after period 8/30, 9/9, 9/10, 2007) | 37 |
| 402-OT | Paint | 12 OT hours (after period, 8/26, 8/30, 2007) | 39 |
| 410 | Laborers | 4 ST hours (after period, 8/27, 2007) | 34 |
| 410-OT | Laborers | 20 OT hours (after period, 8/26, 10/14, 2007) | 41 |
| 460 | Purchasing | 1.5 ST hours (after period, 9/26, 2007) | 27 |
| | | Total Disallowed: ST=251.5 hours OT=99.5 hours | |

Material Costs Allowed and Disallowed

72. The government questioned BAE's multiple listing of Americoat 235, Ameron T-10 Thinner, and Amercoat 861 Accelerator charged in its Material Status Report (gov't br. at 25; R4, tab 121 at 8-10). The government contends that "this requirement did not arise as a result of Task Order Modification 06, but rather was a requirement that existed under the original Contract" (gov't br. at 25). When BAE began the cloverleaf replacement work, painting of the tanks had been completed. We find that the paint material ordered and charged was for repainting and touchup of the tanks arising as a result of the cloverleaf replacement work and are therefore allowable.

73. The government also called attention to several small material purchases whose delivery dates occurred on 14, 17, 21 and 28 August 2007 (gov't br. at 41; R4, tab 112 at 20, 33, 36, 41). Except for $810.00 worth of material delivered to BAE on 28 August 2007 by Rain for Rent, we allow the other material costs since the cloverleaf replacement work was not completed until 25 August 2007.

74. CO Panton issued her decision on 25 July 2013. She denied BAE's cloverleaf claim on the ground that it had "failed to demonstrate that the costs cited in [the] claim are reasonable and relate to the work done on the cloverleaf repairs." (R4, tab 137 at 1 of 8) In denying BAE's claim, CO Panton relied chiefly on Mr. Large's estimate which allowed roughly $4,000 per cloverleaf. She compared BAE's claim with her past cloverleaf replacement experience:

> On the LSV-6 in Kuwait, the Army paid $660 per cloverleaf, and when the ship returned to the United States, the Army paid $1,637.60 per cloverleaf. On the LSVs 2, 3, 4 and 5 (subsequent contracts), the Army paid as low as $1,575.00 and as high as $1,986.00. You have already been paid a minimum of twice the amount of any price obtained from other shipyards.... Your current claim would be ten times that of some of the shipyards as you are seeking almost $16,000 per cloverleaf.

(*Id.* at 7 of 8)

75. CO Panton found BAE's labor charges significantly overstated: She found BAE's $51,726 in overtime unallowable because BAE had agreed that the government would pay the fully burdened labor rate of $73.50 per hour for additional work. Nor did she find BAE's $4,102 ST labor hours reasonable. Based on Mr. Large's progress report, she found BAE performed its cloverleaf work between 24 July and 10 August 2007, a period of 18 calendar days. She found that Mr. Large recorded approximately 582 worker-days during the 18-day period and concluded that BAE's claim that it spent roughly 512 worker-days on the cloverleaf work not credible in light of what she characterized as "getting-to-the-end-of-performance-working-on-everything phase of the contract." (R4, tab 137 at 7 of 8)

76. CO Panton dismissed the DCAA audit findings stating:

> All DCAA did was verify the addition of the claim without verifying that the costs claimed related to the work performed on the cloverleaf repairs. DCAA did not have any of the original time cards or any other information beyond the summary you provided. DCAA specifically did not examine entitlement, but only looked at quantum and whether BAE charged the $285,101 to the cloverleaf

23

item. DCAA had no knowledge of the actual facts and did
not look beyond the information offered by BAE.

(R4, tab 137 at 6 of 8)

77. BAE appealed the CO decision by notice dated 2 August 2013. The Board docketed the appeal as ASBCA No. 58809 and consolidated the appeal with ASBCA No. 58810, an appeal relating to the replacement of piping on the LSV-5. Both appeals, along with a third appeal, ASBCA No. 59642, docketed on 24 October 2014, were heard in January 2015.

## DECISION

On 28 June 2007, 90 days into a 120-day vessel maintenance project of the LSV-5, the CO orally directed BAE to procure 24 cloverleafs ostensibly to replace the deteriorated cloverleafs identified earlier (finding 9). When BAE did not agree to the $96,157 estimate to do the work, the CO issued unilateral Mod. No. 6 three weeks later on 19 July 2007 directing BAE to proceed with the work and to complete it by 23 August 2007 (finding 15). It is undisputed that BAE completed the installation, testing and painting of the cloverleafs, and restored the various tanks under the vessel's main deck affected by that work (finding 43). The CO acknowledged that BAE should be compensated for the cloverleaf replacement work (finding 24). The dispute in this appeal centers upon the appropriate amount of equitable adjustment.

After it completed the LSV-5 project, BAE submitted a $381,245 certified claim. With $96,157 allowed and paid by unilateral Mod. No. 6, BAE presented a net claim of $285,101. (Finding 50) As BAE advised the CO before it began the cloverleaf replacement work, its claim would be based upon actual costs incurred (finding 25). In denying BAE's claim, the CO relied chiefly on her ship surveyor's, Mr. Large, estimate (finding 74). She disallowed OT on the basis that BAE had agreed that the government would pay the fully burdened rate of $73.50 per hour for additional work (finding 75). She also dismissed the DCAA audit findings because DCAA "had no knowledge of the actual facts" and verified "the addition of the claim without verifying that the costs claimed related to the work performed on the cloverleaf repairs" (finding 76). Thus, the dispute before us also presents the question of whether actual incurred costs, to the extent proven to have been related to the cloverleaf replacement work, or the government's pre-performance estimate would provide the better measure of equitable adjustment.

The "preferred" method of proving a claim is by "actual cost method." This method is preferred because "it provides the court, or contracting officer, with documented underlying expenses, ensuring that the final amount of the equitable adjustment will be just that – equitable – and not a windfall for either the government

24

or the contractor." *Dawco Construction, Inc. v. United States*, 930 F.2d 872, 882 (Fed. Cir. 1991); *Advanced Engineering & Planning Corporation*, ASBCA Nos. 53366, 54044, 05-1 BCA ¶ 32,806 at 162,336. Estimates are a preferred method of pricing equitable adjustments only where actual costs are not available. *Bergman Construction Corp.*, ASBCA No. 15020, 72-1 BCA ¶ 9411 at 43,716 (rejecting both contractor and government estimates where the estimates did not conform to available actual cost data).

### *Neither the Government's Estimate nor what it Paid in Other LSV Projects Equitably Compensated BAE for its Cloverleaf Replacement Work on the LSV-5*

Equitable adjustments are corrective measures used to keep a contractor whole when the government changes a contract. *EJB Facilities Services*, ASBCA No. 57547, 13 BCA ¶ 35,399 at 173,680 (quoting *Bruce Construction Corp. v. United States*, 324 F.2d 516, 518 (Ct. Cl. 1963)). The evidence shows that, as of 19 July 2007 when CO Panton issued unilateral Mod. No. 6, BAE's work on "FUEL TANK CLEANING AND INSPECTION" (Item 2030 under DO No. 2) was 98% complete (finding 30), and BAE had cleaned some of the other tanks below the main deck (finding 29). We found that before BAE started the cloverleaf replacement work, it had painted the affected tanks underneath the main deck except for the two fuel tanks which did not require painting (finding 44).

According to BAE's deck plate supervisor, Mr. Giacalone, who was on the vessel every day, because the cloverleaf replacement work was ordered late, BAE was required to redo work it had already accomplished: (1) "recleaning the tanks"; (2) "extra work in pumping...the fuel tanks a couple of times"; (3) "recleaning ballast tanks"; (4) "pumping the oil back into the fuel tanks"; and (5) stationing associated fire watch. With painting, BAE had to start all over again because the tanks had already been painted, and had to repaint or retouch the areas affected by welding. (Finding 34)

In denying BAE's claim, the CO relied chiefly upon Mr. Large's pre-performance estimate (finding 74). Mr. Large's estimate was based upon cropping out and replacing by welding 24 cloverleafs, power tooling, cleaning and painting the cloverleafs and all disturbed areas and testing them (finding 17). At the hearing, Mr. Large testified he estimated 50 ST hours for each of the 24 cloverleafs. He estimated moving each cloverleaf could take an hour, three hours to crop out each cloverleafs, eight hours to weld each new cloverleaf into place, and one to two hours for paint surface preparation, and three hours for painting each coat. (Finding 20)

From Mr. Large's estimate and his testimony at the hearing, we found he gave little or no consideration to what turned out to be a significantly more complicated undertaking requiring additional tank cleaning and painting work that had been accomplished, and repairing damage to the painting that had been accomplished. We

25

found in issuing Mod. No. 6 unilaterally, CO Panton made no effort to determine from BAE to what extent its workforce and schedule would be impacted, and to what extent work BAE already accomplished would have to be redone when she ordered the cloverleaf replacement work late in the vessel's availability. (Finding 20)

Nor are we persuaded what the government historically paid for replacing cloverleafs on other LSVs should be the measure of cost reasonableness in this case (*see* finding 74). The government has not shown that the cloverleafs required to be replaced in the examples it gave were ordered under similar circumstances, i.e., close to the end of the vessel's availability and requiring rework and restoration of work already completed. These examples are not persuasive evidence that BAE's costs were unreasonable.

We conclude that neither Mr. Large's estimate nor what the government paid on other LSV repair projects would equitably compensate BAE for its cloverleaf replacement work it performed on the LSV-5.

### *BAE Had a Reliable Cost Accounting System in Place to Collect the Actual Costs Incurred for Changed Work*

To collect the labor and material costs incurred for the cloverleaf replacement work, BAE assigned a separate charge number – Account 3002 – in its existing Job Order Accounting System (findings 51, 52). Within its Job Order Accounting System, BAE's Job Order Status Report summarized the ST and OT labor hours charged to Account 3002 (finding 52) and its Material Status Report summarized the material charged to Account 3002 (finding 54). BAE's labor distribution report, listed by trade, by date, each employee's ST and OT labor hours charged to the cloverleaf replacement account – Account 3002 – (finding 67) based upon timesheets for each hourly employee filled out by supervisors of the work item involved and entered into BAE's computer system by its payroll supervisor (finding 53). BAE's material purchase orders were filled out by a supervisor with an account number to which the material would be charged, and would then be entered into BAE's computer system by purchasing employees (finding 54). Subject to entry and judgmental errors which could occur from time to time, we found that BAE had a structured and reliable cost accounting system in place for collecting and allocating actual costs incurred for the cloverleaf replacement work (finding 55).

### *BAE was Not Obligated to Delay, Suspend or Reschedule Work before the CO Issued a Written Modification*

Contract 0005 included DFARS 252.243-7001, PRICING OF CONTRACT MODIFICATION (DEC 1991) providing "When costs are a factor in any price adjustment under this contract, the contract cost principles and procedures in FAR Part 31 and

DFARS Part 231, in effect on the date of this contract apply" (finding 4). FAR 31.201-2 provides that the factors to be considered in determining whether a cost is allowable include "(1) Reasonableness. (2) Allocability....[and] (4) Terms of the contract."

The government argues it was unreasonable for BAE to perform cloverleaf-related work after 15 June 2007, the day on which Mr. Large identified 20 cloverleafs to be replaced. It contends that BAE should not have performed any cloverleaf-related work that had to be "re-done." (Gov't br. at 86)

Since section C.0.1.5 of Contract 0005 provided that Large, as the COR, was not empowered to obligate the government for additional work (finding 6), BAE had no obligation to delay, suspend, or reschedule ongoing contract work by virtue of Large's identification on 15 June 2007 20 cloverleafs on the main deck of the vessel to be replaced (finding 7). Nor did BAE have any obligation to delay, suspend, or reschedule any ongoing contract work by virtue of CO Panton's verbal direction on 28 June 2007. It was only when CO Panton was told, erroneously, that BAE might not be willingly to replace the cloverleafs that she recognized that BAE could not be required to proceed without a "written change order" as provided under the Changes clause (findings 4, 14). She then issued Mod. No. 6 unilaterally on 19 July 2007 specifying, for the first time in writing, the scope of the cloverleaf replacement work BAE was expected to accomplish and the contract completion date (findings 15, 16, 17).

To minimize the disruptive impact of the cloverleaf replacement work, the CO could have issued a written change order shortly after 15 June 2007 when it became obvious there was a disagreement on price (finding 8). Or, CO Panton could have issued a unilateral change order on 28 June 2007 when she visited the vessel. Instead, she waited until 19 July 2007. Even though BAE was unilaterally given an extra 27 days to complete the vessel, we conclude BAE was not obligated to delay, suspend, or reschedule its existing contract work and risk completing its work late and subject itself to possible assessment of liquidated damages.

### *BAE Had to Re-Clean the Fuel Tanks*

Item 2030 of DO No. 2 required BAE to clean and inspect the vessel's fuel tanks (finding 3). As bid this was a $129,338.91 item. The government contends that BAE in claiming 1,047 hours for "Laborers Labor" improperly claimed cleaning LSV-5's fuel tanks as a part of the cloverleaf replacement work. According to the government, "at the time of the cloverleaf installation, the tanks had not previously been closed." (Gov't br. at 82)

27

We do not find Mr. Large's testimony to the effect that the fuel tanks had not been closed at the time of the cloverleaf installation meant no fuel tank work had to be redone. The evidence shows that, as of 19 July 2007, the date CO Panton issued unilateral Mod. No. 6, BAE's work on "FUEL TANK CLEANING AND INSPECTION" (Item 2030) was 98% finished (finding 30). Because the cloverleaf replacement work was ordered late, Mr. Giacalone testified that BAE was required to redo work it had already accomplished: "recleaning the tanks"; "extra work in pumping...the fuel tanks a couple of times"; and "pumping the oil back into the fuel tanks" (finding 34).

### *BAE's Claim for Painting Labor Hours was not for Work It was Already Required to Perform*

Item 2033 of DO No. 2 was for "Hull Cleaning and Painting (Main Deck and Above, External Areas)" (finding 3). Citing Item 2033 and Section C.33.9.5 of Contract 0005[8], the government contends that BAE is "claiming 618.50 'Paint Labor' hours even though painting the cloverleaves [sic] was a task the appellant was required to perform" (gov't br. at 81).

Some 12 tanks were affected by the cloverleaf replacement work. There were ballast tanks, fuel tanks, and potable water tanks and they were located "[a]ll over the deck of the ship." (Finding 29) Except for the two fuel tanks which did not require painting, BAE had painted the affected tanks underneath the main deck before it started the cloverleaf replacement work (finding 44). BAE's Production Schedule for the LSV-5 showed that, as of 19 July 2007, Item 2033 "HULL CLEANING AND PAINTING (MN DK & ABV, EXT AREA)" was 93% complete. The same schedule showed that #2 P/C/S (Port/Center/Starboard) and #1 Center Tanks were 100% complete, and only #1 STBD Fuel Oil Tank remained to be done. (Finding 30)

Because the affected tanks had already been painted, BAE had to "restage" inside the tanks and hang fire cloth curtains around the bottom of the cloverleaf cutouts and on deck to protect the new paint (finding 31). Where the paint underneath the cloverleaf installations inside the tanks were affected by welding, they had to be repainted or retouched up (finding 34).

Since BAE's claim was for repainting the various affected tanks under the main deck and not for cleaning the hull or painting the external areas above the main deck, we find BAE's painting claim is not a part of the work it was already obligated to do.

---

[8] Section C.33.9.5 of Contract 0005 specified the paint colors to be used in painting deck fittings, tank vent valves and deck equipment (R4, tab 1 at 109).

## BAE is Entitled to Recover Overtime Premium Incurred in Completing the Cloverleaf Replacement Work

Out of the 4,102.4 labor hours claimed, BAE claimed 1,407.50 labor hours as OT at a $110.25 hourly rate ($73.50 + $36.75). The government argues that "[t]he Contract never authorized overtime, nor does the appellant allege it received authorization for overtime" (gov't br. at 84). The government also argues that since the contract only authorized payment of $73.50 per hour under the fully burdened rate provision, BAE is not entitled, as a matter of law, to be paid overtime at the OT rate (*id.*).

The fully burdened rate provision provides that "Offerors shall include a fully burdened labor rate *to be used in negotiating changes*. The rate must include all costs *for negotiating changes*.... The offeror shall insert rates below that it agrees *to use in negotiating changes* for new or additional work." (Finding 5)

We disagree with the CO's interpretation that the $73.50 per hour fully burdened rate is applicable to the OT hours BAE worked in this case. First, the fully burdened rate provision does not mention overtime at all. Second, the provision requires the $73.50 per hour rate to be used "in negotiating changes." There was no negotiation on the cloverleaf replacement work. BAE priced the work at $217,408.88 (finding 8); the government priced the work at $96,157 (findings 10, 11). When the CO was told that BAE would not do the work (finding 14), she issued Mod. No. 6 unilaterally on 19 July 2007 pricing the "Main Deck Cloverleaf Replacement" work at $96,157 (finding 15). BAE responded by proceeding with the work and establishing a separate number that would allow settlement "based on actual cost plus any additional extension cost" (finding 25).

To impose the $73.50 rate on OT work when there was no negotiation would be inconsistent with the plain meaning of the fully burdened rate provision of the contract. In interpreting contract provisions, we must "begin with the plain language," and we must "interpret the contract in a manner that gives meaning to all of its provisions and makes sense." *McAbee Construction, Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996).

CO Panton could have limited the government's exposure to OT charges by negotiating a fixed-price modification with BAE and thus shifting the risk of actual costs to be incurred to BAE. She did not do so. FAR 22.103-4(a) authorizes the government to approve the use of overtime if it is necessary to: "(1) Meet essential delivery or performance schedules," and (2) "Make up for delays beyond the control and without the fault or negligence of the contractor." Although FAR 22.103-4(i) provides "Approvals for using overtime shall ordinarily be prospective," it recognizes "if justified by emergency circumstances, approvals may be retroactive." (Finding 57,

29

n.6) The CO's explanation for denying OT on the basis that Contract 0005 was a "calendar day" contract and "[i]t's up to the contractor...to plan [its] time (*see* finding 58) makes no sense.

There is no dispute that BAE incurred OT hours in replacing the cloverleafs. BAE's labor distribution report showed OT labor hours charged to the cloverleaf replacement account (finding 67). DCAA was able to reconcile BAE's claimed labor hours, including OT hours for the cloverleaf replacement work to the labor distribution report (finding 62). To deny BAE's OT hours necessary to complete the cloverleaf replacement work based on the government's unilaterally established contract completion date would not make BAE whole for the additional work. *Bruce Constr.*, 324 F.2d at 516; *VHC Inc. v. Peters*, 179 F.3d 1363, 1366 (Fed. Cir. 1999); *Precision Dynamics, Inc.*, ASBCA No. 50519, 05-2 BCA ¶ 33,071 at 163,926.

### *Equitable Adjustment Allowed and Disallowed*

BAE contends "DCAA's Audit Report is evidence" and auditor, Mr. Bernacchi's testimony is also evidence. Because such evidence on the reasonableness of its claim is "uncontradicted," BAE contends it is entitled to the entire amount of the $381,258 (less the $96,157 paid) claimed. (App. br. at 52) BAE says it has established the reasonableness of its costs in two ways:

1. The DCAA Audit Report and testimony of the DCAA Auditor, and

2. Written and testimonial evidence of the work and materials that were necessary to install the cloverleafs.

(*Id.*)

As to BAE's first point, we disagree that BAE should be awarded the entire amount claimed simply because the DCAA audit report and auditor Mr. Bernacchi's testimony was "uncontradicted" (app. br. at 52). First, DCAA's 31 August 2012 audit report qualified its findings by stating that its purpose was "to review the quantum aspects of the claim" and "assumes BAE Systems SFSR can demonstrate legal entitlement" (finding 61). Second, Mr. Bernacchi acknowledged that he lacked the technical expertise to make technical evaluations, and the evidence showed that he did not ask for or received technical assistance in evaluating the technical complexities involved in replacing the cloverleafs (finding 56).

Contrary to BAE's assertions, the DCAA audit does not constitute an admission on the part of the government but is only one piece of evidence in determining damages. *Orlosky Inc. v. United States*, 68 Fed. Cl. 296, 317 (2005) (citing *Raytheon*

*Co. v. White*, 305 F.3d 1354 (Fed. Cir. 2002) and *A.C. Ball Co. v. United States*, 531 F.2d 993, 1005 (Ct. Cl. 1976)). The Federal Circuit has said "Under the Contract Disputes Act, however, it is the function and responsibility of the Board, and not of the auditor, to decide the question of entitlement." *Charles G. Williams Construction, Inc. v. White*, 271 F.3d 1055, 1059 (Fed. Cir. 2001). Similarly, the Court of Claims has said "[r]ecoverable damages cannot be proved by a naked claim for a return of costs even where they are verified. The costs must be tied in to fault on defendant's part." *Boyajian v. United States*, 423 F.2d 1231, 1239 (Ct. Cl. 1970) (quoting *River Construction Corp. v. United States*, 159 Ct. Cl. 254, 270-71 (1962)).

As to BAE's second point, we are persuaded by Mr. Giacalone's detailed testimony, given at the hearing after we denied BAE's motion for summary judgment[9], to the effect that the cloverleaf replacement required substantial rework of surrounding work items that had been completed (findings 28-34). We have found that BAE had to assign extra work force of various trades and work overtime in order to meet the contract completion date unilaterally imposed by Modification No. 6 (findings 42, 43, 44).

Based upon our finding that the cloverleaf replacement work was completed on 25 August 2007 (finding 42), we disallow all labor charges claimed after that date with the exception of 32.50 ST labor hours charged to Account 3002 between 28 August and 18 September 2007 for disposing waste and hazmat (finding 68). Without proof that Mr. Giacalone performed cloverleaf-related work chargeable to Account 3002, we disallow 16 ST hours and 2.5 and 3.5 OT differentials charged on 17 August 2007 when dock trial took place and on 20 August 2007 when sea trial took place (finding 69). Since Mr. Giacalone was a deck plate supervisor with other responsibilities, and since he was not physically involved with the actual removal and installation of the cloverleafs and associated tank and painting work, we disallow 6 out of every 8 hours claimed each day, or 126 out of 168 ST and 49 out of 65.5 OT hours as chargeable to Account 3002 (finding 70). Labor hours Mr. Giacalone incurred related to the base contract work or other changed work should be charged to those accounts.

Based upon our analysis above, we allow $261,790 on BAE's cloverleaf replacement claim computed as follows:

---

[9] *See BAE Systems San Francisco Ship Repair*, ASBCA No. 58809, 14-1 BCA ¶ 35,642. BAE complained that in ignoring the DCAA report "as evidence of reasonableness," the Board "forced Appellant to call the DCAA Auditor to testify over and over again that he reviewed BAE's claimed cost to determine if they were reasonable under FAR regulations and found those costs to be reasonable" (app. br. at 51 n.20).

| Cost Element | Amount |
|---|---|
| 3,851 ST hrs. (4,102.5 hrs. – 251.5 hrs.) @ $73.50 | $283,048.50 |
| 1,308 OT hrs. (1,407.5 hrs. – 99.50 hrs.) @ $36.75 | $ 48,069.00 |
| Materials: 24 cloverleafs: 24 X $145.00 | $ 3,480.00 |
| Other Materials: $12,710.00 - $$810.00 (finding 73) | $ 11,900.00 |
| Subcontractors (Subs) | $ 7,200.00 |
| G&A @ 8.82% on Materials and Subs<br>8.82% X $22,580.00 | $ 1,991.50 |
| Profit @ 10% on Materials and Subs<br>10% X $22,580.00 | $ 2,258.00 |
| Total Equitable Adjustment | $357,947.00 |
| Less Amount Paid by Modification No. 6 | ($96,157.00) |
| Equitable Adjustment Due | $261,790.00 |

## CONCLUSION

Because BAE has proven by a preponderance of the evidence that it incurred labor hours and material costs in reworking contract work items that it had completed or substantially completed in order to replace 24 deteriorated cloverleafs ordered late during LSV-5's availability, we hold that it is entitled to $261,790.00 in equitable adjustment, with CDA interest running from 15 July 2011, the putative date the CO received BAE's 11 July 2011 certified claim, in accordance with 41 U.S.C. § 7109.

Dated: 11 January 2016

PETER D. TING
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58809, Appeal of BAE Systems San Francisco Ship Repair, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals